13CV5878

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| **HICHAM AZKOUR,** *Plaintiff,* v. **BOWERY RESIDENTS COMMITTEE, INC.,** LAWRENCE a/k/a MUZZY ROSENBLATT, JANET FORTE, KEVIN MARTIN, TEREEN LLEWELYN-MILLER, ANGELA KEDZIOR, JOHN DOE 1-5, AND JANE DOE 1-5, *Defendants.* | <u>Civil Action No.</u> <br><br> <u>JURY TRIAL DEMANDED</u> <br><br>  |

---

## COMPLAINT

---

HICHAM AZKOUR, pro se

93 Pitt Street, Apt. 3B

New York, New York 10002

Email: <u>hicham.azkour@gmail.com</u>

## A. NATURE OF THE ACTION

1. HICHAM AZKOUR ("Plaintiff"), pro se, *in forma pauperis*, **brings the present action under 42 U.S.C. §§ 1981, 1983, 1986, and 3613** to complain and allege that the Bowery Residents' Committee, Inc. ("BRC"), Inc., Lawrence a/k/a Muzzy Rosenblatt, Janet Forte, Tereen Llewelyn-Miller, Kevin Martin, John Does from 1 to 5, Jane Does from 1 to 5, and all BRC officials, employees, agents, who have supervisory duties ("Defendants"), severally and jointly, individually and in their official capacity, engaged in conducts under the color of New York State law, which deprived Plaintiff of rights, privileges, and immunities secured by the United States Constitution and federal statutes.

2. Defendants are liable under 42 U.S.C. § 1983 because they are a municipality's contractors and are supervisory officers or employees who were personally involved in the events underlying the present action

3. They are liable because (1) they directly knew about Plaintiff's grievances, (2) they failed to remedy the wrongs after learning of Plaintiff's grievances, (3) they created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue, or (4) they were grossly negligent in managing subordinates who caused the unlawful conditions or events.

4. The above-named and unnamed defendants denied Plaintiff rights afforded and guaranteed by 42 U.S.C. § 10841, Sections 1 and 4 of Article XVII of the New York State Constitution, and §§ 33.01, 33.02, and 33.03 of the New York Mental Hygiene Law ("NYMHL").

5. At the present time, Plaintiff's lives in a permanent, *supportive housing* single occupancy unit owned and/or operated by BRC pursuant to 42 U.S.C. § 11360(15). BRC is also an entity as defined by 42 U.S.C. § 11360(6).

6. In violation of 42 U.S.C. § 290cc-33(a)(2), the above-named and unnamed defendants, on the ground of his religion (Muslim), excluded him from participation in, denied him the benefits of, and subjected him to discrimination under, a program or activity funded in whole or in part with funds made available under section 42 U.S.C. § 290cc-21.

7. In violation of 42 U.S.C. § 1981, Defendants discriminated against him, on account of his race as Arab, by depriving him of the right to make and enforce a contract, to the full and equal benefit of all laws and proceedings for his personal security and the security of his property.

8. In violation of 42 U.S.C. § 1985(3), Defendants conspired for the purpose of depriving Plaintiff, either directly or indirectly, of the equal protection of the laws and of equal privileges and immunities under the laws. Defendants acted in furtherance of their conspiracy by having other individuals intimidate him. Plaintiff was injured in his person and property. Defendants' conspiracy was motivated by Plaintiff's race

2

(Arab).

9.  Defendants had knowledge of all the wrongs conspired to be done, as alleged in ¶ 8 and elsewhere in Complaint, or are about to be committed, and had the power to prevent or aid in preventing the commission of the same. However, in violation of 42 U.S.C. § 1986 neglected and refused so to do.

10. In violation of 42 U.S.C. § 2000d, Defendants, on the ground of his race (Arab), color (White), and national origin (Moroccan), excluded Plaintiff from participation in, denied him the benefits of, and subjected him to discrimination under a program or activity receiving Federal financial assistance[1].

11. In violation of 42 U.S.C. § 3604, Defendants have discriminated against Plaintiff in the terms, conditions, and privileges of rental of a dwelling, and in the provision of services or facilities in connection therewith, because of race (Arab), color (White), religion (Muslim), and national origin (Moroccan).

12. Defendants' acts constitute gross negligence and deliberate indifference to Plaintiff's constitutional rights as to his person and property.

13. Defendants violated Plaintiff's right to the equal protection clause of the Fourteenth Amendment to the United States Constitution.

---

[1] *See* 42 U.S.C. § 2000d-4a.

14. Defendants violated Article XVII of the New York State Constitution by subjecting Plaintiff to prohibited, inhumane treatment.

15. By engaging in the above-described unlawful, egregious acts, and recklessly inflicting upon Plaintiff emotional distress, Defendants caused Plaintiff's physical and mental health to deteriorate.

16. Defendants' unlawful and outrageous acts caused Plaintiff the loss and damage of his property.

17. Plaintiff seeks injunctive relief, declaratory relief, compensatory damages, punitive damages, treble damages where applicable, liquidated damages where applicable, and any other, further, just, and equitable relief by this Court.

## B. **PARTIES**

18. Plaintiff, HICHAM AZKOUR, is an adult, private individual who resides at 93 Pitt Street, Apartment No. 3B, New York, New York.

19. Since December 2010, Plaintiff has been a homeless individual as defined by 42 U.S.C. § 290cc–34(2) and remained the same while residing at Jack Ryan Residence, a transitional program operated and managed by BRC. Under 42 U.S.C. § 290cc–34(1), Plaintiff has also been, at all relevant times in this complaint, an eligible homeless individual as described in 42 U.S.C. § 290cc-22(a).

4

20. Since December 2010, Plaintiff has been a homeless person or a person at the risk of being homeless as defined by 42 U.S.C. § 11302.

21. Plaintiff has also been a homeless person with a disability as defined by 42 U.S.C. § 11360(9).

22. From April 23, 2011 to July 3, 2013, Plaintiff, per § 21-301(c) of the New York City Administrative Code ("N.Y.C. Admin. Code") has been a homeless person eligible for transitional housing or services from the New York City Department of Homeless Services pursuant to federal, state and local laws and such rules and regulations as may be promulgated pursuant thereto.

23. Defendant BRC is an entity meeting the definition of 42 U.S.C. § 254b and providing services as defined by 42 U.S.C. § 290cc-22(a).

24. Defendant Angela Kedzior is a New York State licensed psychiatrist and is the *only* BRC psychiatrist and employee supervising *all* BRC clients' mental health at the 28 programs throughout New York. Her workplace is located at 131 West 25th Street 12th Floor New York, NY 10001.

25. Defendant BRC is a currently active, domestic, not-for-profit entity, which has been registered with the New York State Department of State since August 24, 1973. As its website states, defendant BRC is a leading provider of housing and services to well over ten thousand of

5

New York City's neediest individuals, through a continuum of housing and nonresidential programs offering health, mental health, treatment for addictions, vocational services, elder services, and supportive communities in which to live. Defendant BRC, according to its website, operates a continuum of 28 programs throughout New York, with a fiscal year 2013 budget of $62 million, over 650 employees, and hundreds more registered volunteers. Defendant BRC is headquartered at 131 West 25th Street 12th Floor New York, NY 10001.

26. Upon information and belief, in February of 2010, BRC signed a long-term lease for an entire building at 127 West 25th Street, New York, New York, where it domiciled the above-enumerated programs. The building was in need of extensive renovations, which were estimated to cost over $13 million.

27. Upon information and belief, pursuant to separate contracts with BRC, the New York City Department of Homeless Services ("DHS") funded the Jack Ryan Residence, a 200-bed homeless shelter, and the 98-bed reception center, and the 32-bed detoxification program is funded with a combination of federal funds and funds from the New York City Department of Heath and Mental Hygiene ("DOHMH"). Additional programs at the site located at 127 West 25th Street, New York, New York ("Building") include a New York State Office of Mental Health and ("OMH") and Medicaid funded case management programs for persons with mental illness; an OMH licensed continuing day treatment program for outpatient mental health services funded by Medicaid and

6

DOHMH; and a Medicaid and DOHMH funded substance abuse services center that is licensed by the New York State Office of Alcoholism and Substance Abuse Services ("OASAS").

28. According to BRC's statement by its Executive Director, defendant Rosenblatt, in a court proceeding, the 200-bed shelter "serve[s] homeless men and women of all ages who have a history of mental illness and who are seeking to attain or maintain stability in their mental health." Located on floors six through nine of the Building, the shelter operates pursuant to BRC's contract with DHS and is licensed by the New York State Office of Temporary and Disability Assistance ("OTDA").

29. In the non-residential portion of the Building, BRC will house the Fred Cooper Substance Abuse Service Center ("SASC"), and a Continuing Day Treatment program ("CDT"). Both programs operate on the tenth floor of the building. According to BRC, the SASC is an outpatient program that will "serve[s] people with alcohol and substance abuse problems who are homeless or marginally housed," and also clients "dually diagnosed with mental illness and substance abuse." In a court proceeding, defendant Rosenblatt stated that the SASC was licensed under the State Mental Hygiene Law and was funded by DOHMH and Medicaid; the CDT program is licensed under OMH and is funded by Medicaid. BRC's Program Descriptions state that the CDT program works with clients who have a "long history of mental illness," many of whom are "dually diagnosed with chemical addictions," providing "on-site psychiatric treatment and medication management, case

management, assistance with entitlements and housing, and rehabilitation activities."

30. In a sworn affidavit submitted to a New York State court, defendant Rosenblatt states that both programs are open to anyone seeking their services, whether or not they are clients of BRC's Shelter, Reception Center or CDCC.

31. All the above-named or unnamed individual defendants are BRC employees. Their place of work is located at 131 West 25th Street 12th Floor New York, NY 10001.

32. The above-named and unnamed individual defendants are supervisors of the Jack Ryan Residence as defined and required by N.Y.C. Admin. Code § 21-312.

33. All the above-named and unnamed individual defendants have the authority to end the unlawful allegations of discrimination and other alleged local, state, and federal violations within the Jack Ryan Residence' premises.

34. All the above-named and unnamed individual defendants have the authority to admit residents into the Jack Ryan Residence and discharge them in accordance and compliance with federal, state, and local laws.

35. All the above-named and unnamed individual defendants have the authority to enforce the internal rules of the Jack Ryan Residence.

8

36. All the above-named and unnamed individual defendants have the authority and duty to report criminal or unlawful acts, which occur within the Jack Ryan Residence's premises, to the federal, state, and local authorities.

37. All the above-named and unnamed individual defendants are required to abide by and implement the laws, rules, and regulations of the federal, state, and local agencies licensing them to operate the above-described programs.

38. All the above-named and unnamed individual defendants created policies or customs under which unlawful practices occurred and allowed such policies or customs to continue.

## C. JURISDICTION AND VENUE

39. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1343, and 1367.

40. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391.

## D. FACTUAL ALLEGATIONS

41. On or about December 8, 2010, Plaintiff was evicted from his apartment located at 21-11 23rd Street, Astoria, New York.

9

42. Plaintiff was evicted due to his inability to pay rent following his unemployment, which was caused by a retaliatory and discriminatory retaliation by his former employer Little Rest Twelve, Inc. [2]

43. Plaintiff was referred to the Bellevue men's shelter, a DHS assessment facility located at 400 E 30th St, New York, New York.

44. On or about June 9, 2011, Plaintiff, following more than two months of assessment by the DHS staff at the Bellevue Men's Shelter, was referred to his permanent shelter at BRC's Boulevard Residence, a 101-bed men's shelter located at 2270 Lexington Avenue, New York, New York.

45. During his stay at the Boulevard, a registered nurse, with the approval of defendant Kedzior, diagnosed Plaintiff with Post Traumatic Stress Disorder and other mental illnesses.

46. Plaintiff diagnoses, for no valid cause or reason, will change overtime to describe him as a psychotic individual suffering from a myriad of psychoses.

47. During his stay, which lasted till, September 9, 2011, Plaintiff did not have the chance to see his caseworker but once.

48. On September 9, 2011, Plaintiff was transferred and admitted to the

---

[2] *See Azkour v. Little Rest Twelve, Inc., et al.,* S.D.N.Y No. 10-cv-4132 (RJS)(KNF) and *Azkour v. Haouzi, et al.,* S.D.N.Y No. 11-cv-5780 (RJS)(KNF).

Jack Ryan Residence.

49. Since he was admitted to the Jack Ryan Residence on or about September 9, 2011, Plaintiff was subjected to psychological, verbal, and physical abuse. He was subjected to assault and theft from BRC clients, all under the watch of BRC employees.

50. Other residents, who are not of Plaintiff's protected class, were protected and treated fairly and, if any unlawful acts were committed or about to be committed against them, BRC employees would intervene promptly to enforce the program's internal rules or call the New York Police Department ("NYPD") to report any unlawful, harmful activity.

51. Despite these allegations, a few employees, who did not commit the alleged unlawful acts described herein, were respectful, humane, diligent, and honest in performing their job.

52. In violation of 42 U.S.C. § 10841(1)(G), some BRC employees, motivated by racial bias, allowed residents of their race, disposition, and character[3] to unlawfully have access to Plaintiff's locker and personal property.

53. During his stay at the Jack Ryan Residence, these employees, with the

---

[3] Residents and employees alike would refer to themselves as "homies" from the same "hood" or "crib". They talk gangster-style slang and are all tattooed. They all listen to the same gangster-style music, with obscene, violent lyrics. They also wear baggy pants drawn down so that one may see their underwear and, on many occasions, their buttocks. Some of these employees were felons and some of them are addicted to drugs.

knowledge of their supervisors or managers, would not take any immediate action when they witness some residents calling Plaintiff "Taliban", "Bin Laden", and "Camel Jockey", referring, *inter alia*, to his race as an Arab and his religion as a Muslim.

54. The BRC management, notwithstanding Plaintiff's repeated complaints, has never remedied this type of hostility and discriminatory harassment.

55. In fact, it worsened through time and, to Plaintiff's surprise, some employees would even encourage such harassment by smiling at the offenders, instead of admonishing them or directing them to cease such unlawful behavior.

56. Most of the time, residents engaging in such discriminatory harassment and violent behavior were under the influence of drugs.

57. Yet, the employees, with the knowledge of their supervisors and their managers, never refer these intoxicated residents to detoxification centers or, in case they refuse detoxification, discharge them in accordance with the OASAS procedure.

58. Plaintiff has been informed by one supervisor – and will present his sworn affidavit to this effect during the discovery phase– that failure to refer these clients to a detoxification center was premeditated and was actually the policy adopted by Defendants to keep receiving money from the government.

12

59. BRC's custom was to keep these among the sober population, letting them thus engage in harmful conducts such as verbal abuse, physical violence, and crimes of property and moral turpitude.

60. **99.99%** of the crimes committed in the Jack Ryan Residence were the acts of BRC's intoxicated residents and drug addicts.

61. When Plaintiff protested such negligence to the managers, some who are as bigoted as their underlings asserted to Plaintiff that his right to a humane treatment environment does not afford him any protection from harm as to his person and property.

62. They also stated to Plaintiff that a humane treatment does not afford him the right to privacy.

63. These managers warned Plaintiff that he should refrain from complaining or he would be transferred to another shelter in the Bronx.

64. They stated to him that he should not complain because he was living in a MICA shelter, a reference to a shelter designed to admit mentally ill and drug-addicted residents and also a disparaging and demeaning reference to Plaintiff's own mental health.

65. Reference to Plaintiff's mental health was contrary to the mandate of Article XVII of the New York Constitution and the ethics of these

13

managers as mental health professionals. It was solely meant to intimidate Plaintiff and makes him feel helpless and vulnerable.

66. On June 26, 2013, at or about 1:15 PM, during a short absence for lunch, residents from the 9th floor, where Plaintiff was assigned his bed (Bed No. 172), accessed his locker, without tampering with the lock[4], under the watch and connivance of two employees, and stole his laptop computer and a collection of valuable software. The market value of such property is more than $4,060.00.

67. Obviously, Plaintiff legitimately bought such computer and the accompanying software when he was employed.

68. When he reported such incident to the management, many residents engaged in aggressive acts towards him. They called him "snitch" and threatened to remove him, with or without the help of the BRC employees or their "homies".

69. Immediately after he became aware of the theft, Plaintiff requested that BRC employees report the theft to NYPD. They refused without explanation.

70. When he insisted, they stated to him that they could not jeopardize the safety of their clients.

---

[4] This suggests, as the NYPD investigating officer implied, was done with the help of a BRC employee.

14

71. Plaintiff called NYPD himself and reported the theft. He provided the investigating officer with the computer's serial number and the purchase receipt in his name.

72. However, to this day, the BRC management, Plaintiff was informed by NYPD, refuses to cooperate with NYPD detectives and provide them with camera footage, invoking thus their clients' rights to privacy. For this reason, the NYPD detective in charge of the investigation stated to Plaintiff that he was not able to make any progress.

73. The BRC management stated to Plaintiff and to the detective in charge of the investigation that they conducted their *own* investigation and that they would soon compile an investigation report with the supporting evidence.

74. Despite his repeated requests to defendants Rosenblatt, Forte, Martin, and Llewelyn-Miller, Plaintiff was denied said investigation report.

75. Plaintiff was actually denied every record in his file, including medical records, whether as a resident at the Jack Ryan Residence or at the Boulevard Residence.

76. As a matter of course and fact, BRC denied Plaintiff copies of his medical and other records in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

77. Moreover, in violation of Section 1177 of HIPAA, BRC knowingly and wrongfully disclosed erroneous individual information to third parties without Plaintiff's consent and with the intent to obtain monetary gain, regardless of the harm committed.

78. When Plaintiff threatened to report these violations to the authorities and, eventually, bring the present action against Defendants, defendants Rosenblatt, Forte, Kevin, and Llewelyn-Miller, in an effort to have an *in terrorem* effect upon Plaintiff and dissuade his from filing any claim against BRC for the above-described abuses and differential treatment, they conspired, in violation of 42 U.S.C. § 1985(3), with Tonie Baez, senior counsel for DHS.

79. On July 10, 2013, at or about 5:00 PM, Ms. Baez, a licensed attorney, misrepresented to Plaintiff, via email, for the purposes of intimidation, interference, and coercion, that she represents BRC and that Plaintiff must cease contacting its managers about any claim, whatsoever.

80. Instead of affording Plaintiff qualified advocacy to communicate and solve grievances, protect and redeem personal property through advocacy and the appropriate, available procedures, Defendants violated 42 U.S.C. § 10841(1)(M) by denying Plaintiff the same on account of his belonging to a protected class.

81. On account of his belonging to a protected class, BRC violated Plaintiff's rights under 42 U.S.C. § 10841(1)(L).

82. As a patient, without fear of retaliation or any type of adverse action, Plaintiff has the right to assert grievances with respect to infringement of the rights described by 42 U.S.C. § 10841 and 42 U.S.C. § 9501, including the right to have such grievances considered in a fair, timely, and impartial grievance procedure provided for or by the Jack Ryan Residence or defendant BRC.

83. On or about July 3, 2013, in a clear act of retaliation, Defendants, without timely resolving Plaintiff's grievances or addressing his legitimate requests, removed him from the Jack Ryan Residence to the Los Vecinos Residence at 93 Pitt Street, New York, New York. The Los Vecinos Residence is a *supportive*, permanent housing program for the mentally ill and disabled people, which is owned, operated, and managed by BRC.

84. Plaintiff was removed to this residence before the official move-in date, which was determined by the New York City Department of Housing Preservation and Development ("HPD") to be on July 15, 2013. He was removed to an unfurnished room, without any allowance to purchase furniture. To this day, Plaintiff sleeps on a bare mattress without sheets and without blanket.

85. When Plaintiff's property was stolen, he also filed a claim with the New York City's Office of the Comptroller on or about July 16, 2013.

86. After investigation, the Office of the Comptroller determined, on or

17

about July 26, 2013, that defendant BRC is the third party responsible or liable for the loss or damage of Plaintiff's property.

87. Albeit the New York City's Office of the Comptroller determined that defendant BRC is liable for the loss and damage of Plaintiff's property, defendant BRC still denies any liability and refuses to replace Plaintiff's stolen property.

88. As set forth below, Defendants have heretofore engaged in a pattern of retaliation and coercion against Plaintiff because, in February 2013, he complained to them about narcotics sale and use in the premises.

89. Since he moved to the Jack Ryan Residence, Plaintiff noticed that defendant BRC, with the knowledge of its Executive Director, managers, and the rest of the employees, Defendants herein, tolerate that residents smoke cigarettes in the facility.

90. As stated above, Plaintiff also noticed Defendants' tolerance and inaction towards the sale and use of narcotics within the confines of their premises and the adjacent vicinity thereof.

91. As a matter of fact, many neighbors complained to NYPD about BRC residents engaging in illegal drugs activity in the neighborhood. This unlawful practice has caused many acts of violence, armed robberies, thefts, and other criminal acts, committed particularly by residents who use or sell narcotics.

92. As described above, all the acts of violence, verbal abuse, bigotry, theft, and other unlawful acts to which Plaintiff was subjected during his stay at the Jack Ryan Residence were committed by residents who are either in the illegal business of selling narcotics or residents who are addicted to drugs.

93. Because defendant BRC did not address Plaintiff's urging complaints about drugs and how it affected his own personal safety, he contacted OASAS on or about February 13, 2013, and complained of this criminal activity. OASAS referred him to its Patient Advocacy Unit Manager, Michael Yorio, Esq.

94. Even though BRC receives funds from OASAS and is licensed to operate its treatment centers by the same, Mr. Yorio, acting in conspiracy with BRC's Executive Director and his managers, falsely represented to Plaintiff that OASAS does not have jurisdiction upon BRC and that he is enjoined from conducting any investigations regarding illegal narcotics sales and use by residents within BRC's facilities.

95. Although article 19 of the NYMHL grants the OASAS Commissioner the power to remedy the alleged violations, *see* NYMHL § 19.09, Mr. Yorio, for inappropriate reasons, decided to ignore Plaintiff's serious allegations.

96. Because no action had been taken by OASAS, Plaintiff

complained to DHS on or about February 13, 2013. Ms. Rachel Mintz, a DHS Program Analyst, promised an investigation. Nevertheless, neither an investigatory report has been provided to Plaintiff following his request under the New York Freedom of Information Act, nor has the criminal activity decreased in volume. Au contraire, the residents admitted to the program, during the last few months of Plaintiff's stay, became more assertive than ever in conducting, with an unheard of impunity, their illegal business within the BRC facility.

97. Since then, BRC and its low-level employees, in a completely hostile attitude dictated by Defendants, have been retaliating against Plaintiff by denying me rights and benefits guaranteed by 42 U.S.C. § 10841 and NYMHL § 33.01 *et seq.*, including denial of his personal safety and the protection of his property.

98. Pursuant to NYMHL § 33.07, a BRC patient or client has the statutory right to keep his property in a safe place, such as his personal locker. Therefore, BRC's personnel must exercise high care and diligence so that the patient or client's property is protected from theft, loss, or damages.

99. When Plaintiff was first admitted to the Jack Ryan Residence, his property was inventoried, including the aforementioned stolen computer, and a signed, dated inventory was placed in his file.

100.    He was also provided with a key to his locker and requested to place all his property within the locker and keep it locked at all times.

101.    He was also enjoined from being in anybody else's bed or space.

102.    As set forth above, on account of his belonging to a protected class only, BRC and its personnel denied him care and diligence. Instead, they afforded him acts of negligence, discrimination, and retaliation, and coercion.

103.    Although she knew he does not suffer from any serious mental illness and that the Hon. Kevin N. Fox, U.S.M.J., determined that he is mentally competent, defendant Kedzior "hyped" Plaintiff's mental health diagnosis so that BRC may financially benefit from the funds allocated to its mental health program by state and local agencies, as matched by federal funds.

104.    This is an unlawful, fraudulent, and harmful practice whose expected result is to increase grants from local, state, and federal agencies.

105.    Upon information and belief, defendant Rosenblatt developed a policy which obligates defendant Kedzior and her nurses to administer to the admitted residents treatments contrary to her professional clinical judgment.

106.    Curiously, some of the staff who administer treatment and medication are not licensed by or registered with the State of New York.

107.     It is a custom known that Defendants summarily discharge any resident who believes he is being administered an inappropriate treatment or medicine, which is inconsistent with the clinical judgment of the mental health professional primarily responsible for such person's treatment. This practice is not only in violation of Section 1177 of HIPAA, but it is also in violation 42 U.S.C. § 10841(3)(B).

## E. <u>CAUSES OF ACTION</u>

## I.     <u>INTENTIONAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981</u>

108.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

109.     Plaintiff is an Arab.

110.     Defendants, for the purpose of 42 U.S.C. § 1981, are persons and private contractors.

111.     Defendants have known since his admission that Plaintiff is an Arab.

112.     As related above, Defendants intentionally, on account of his race as Arab, denied Plaintiff the right to make and enforce a contract with BRC, to give evidence to investigating officers, and to the full and

22

equal benefit of all laws and proceedings for the security of his person and property as an eligible homeless person.

113.     Defendants, on account of his race as an Arab, discriminated against Plaintiff by excluding him from enjoying all benefits, privileges, terms, and conditions of the contractual relationship, including the benefit of referring him assisted housing landlords.

114.     Specifically, Defendants, on account of his race as an Arab, denied Plaintiff protections of his rights under HIPAA, Title V of the Mental Health Systems Act, 42 U.S.C. § 9501 *et seq.*, the Restatement of Bill of Rights for Mental Health Patients, **42 U.S.C. § 10841,** Sections 1 and 4 of Article XVII of the New York State Constitution, and NYMHL §§ 33.01, 33.02, and 33.03.

115.     Defendants, based upon his race, denied Plaintiff medical and other records.

116.     Defendants, based upon his race, denied Plaintiff immediate access to NYPD to report his stolen property.

117.     Defendants, based upon his race, denied Plaintiff any participation in a police investigation.

118.     Defendants, based upon his race, denied Plaintiff access to the competent agencies in order for him to report violations and criminal activity affecting his well being as a resident.

23

119.     Defendants, based upon his race, denied Plaintiff the right to engage in protected activity.

120.     Defendants, based upon his race, denied Plaintiff the right to be secure in his person and his belongings.

121.     Defendants, based upon his race, denied Plaintiff their referral services to the type of permanent housing suiting his needs as a mentally balanced individual not suffering from any psychoses.

122.     Defendants, based upon his race, disseminated evaluations and reports, based upon a fraudulent diagnosis of Plaintiff, for the purpose of securing financial gain to defendant BRC.

123.     Defendants are private actors. However, they also acted under the color of New York State law by the power vested unto them by their contracts and agreements with the State of New York.

## II.   UNLAWFUL RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

124.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

125.     Plaintiff participated in a protected activity by complaining of unlawful acts to the managers of defendant BRC and the Jack Ryan

24

Residence.

126.     Plaintiff participated in a protected activity by complaining to the managers of some employees who failed to enforce the Jack Ryan Residence's internal rules.

127.     Plaintiff participated in a protected activity by complaining to the managers of some employees who showed bias and racial animus by denying Plaintiff the right to be safe in his person and property within the confines of the Jack Ryan Residence.

128.     Plaintiff participated in a protected activity by complaining to DHS about criminal activity affecting his personal safety and the security of his property.

129.     Plaintiff participated in a protected activity by complaining to OASAS of narcotics sales and use within the premises of the Jack Ryan Residence.

130.     Defendants undertook an adverse action against Plaintiff by denying him the most basic rights under HIPAA, Title V of the Mental Health Systems Act, 42 U.S.C. § 9501 *et seq.*, the Restatement of Bill of Rights for Mental Health Patients, **42 U.S.C. § 10841**, Sections 1 and 4 of Article XVII of the New York State Constitution, and NYMHL §§ 33.01, 33.02, and 33.03.

131.     As a reprisal, Defendants, with their knowledge and connivance,

25

had residents unlawfully access Plaintiff's locker and steal his property.

132.    In retaliation, Defendants deliberately and prematurely removed Plaintiff to another residence so that they may deny him full participation in any investigation as to the theft of his property.

133.    Although Plaintiff's move-out date was scheduled for July 15, 2013 by HPD, Defendants removed him on July 3, 2013.

134.    Plaintiff was not able to secure, as all residents do prior to their move-out date, any furniture allowance from the New York City Department of Social Services.

135.    Since July 3, 2013 to this day, Plaintiff slept on a bare mattress without any sheets, pillow, or blanket.

136.    Defendants still continue to deny Plaintiff the aforementioned rights because, on or about July 10, 2013, he filed a civil rights complaint with the Office for Civil Rights, U.S. Department of Health and Human Services, complaining of the same.

137.    Acts of discriminatory harassment by both residents and employees, threats of violence, acts of violence towards Plaintiff by drug-addicted residents, who were informed of Plaintiff's complaints, the hasty removal of Plaintiff, and the theft of Plaintiff's property all happened immediately after he began complaining to DHS and OASAS of the criminal activity in the Jack Ryan Residence – criminal

activity consisting mainly of narcotics sales and use, theft, and acts of violence.

## III.  COLOR OF LAW VIOLATIONS UNDER 42 U.S.C. § 1983

138.      Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

139.      Defendants are private contractors of the City of New York and the State of New York.

140.      Their private action is infused with "state action" because Defendants are performing a function public or governmental in nature, and which would have to be performed by the government but for the activities of the private parties.

141.      BRC contracted the operation and management of the Jack Ryan Residence from DHS, a department of the City of New York.

142.      BRC also receives funds from DOHMH and OMH to operate and manage, whether as a contractor or not, such mental health program and other similar programs throughout the City of New York.

143.      DHS funded the Jack Ryan Residence and other programs operated and managed by BRC, including the Boulevard Residence.

144.     According to NYMHL § 61.01, the City of New York and State of New York receive federal financial assistance to fund the above-described programs.

145.     In their operation and management of any facility or program, BRC, its officers, employees, and agents, including doctors, must abide by the local, state, and federal laws in performing their duties and delivering services to the clientele eligible and covered by the laws enumerated above.

146.     Eligible clientele or eligible clients mean homeless people with mental illnesses and/or drug addiction.

147.     As stated above, Plaintiff is an eligible client and Defendants acted under the color of New York law to deprive him of rights and privileges guaranteed by the Constitution or laws of the United States.

148.     Defendants deprived Plaintiff of his rights guaranteed by Section 1[5] and Section 4[6], Article VII, of the New York State Constitution.

---

[5] Section 1 states:

> The protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made by the state and by such of its subdivisions and in such manner, and by such means as the legislature shall from time to time determine.

[6] Section 4 states:

149.    By violating Plaintiff's rights as a patient, Defendants acted with total disregard to his mental health, which is a matter of public concern.

150.    By subjecting Plaintiff to an environment where care and support of the needy are dictated by their financial gain, Defendants violated Plaintiff's rights as protected by the New York State Constitution and acted unethically and with intent to defraud the taxpayer.

151.    Defendant subjected Plaintiff to an environment where he became the victim of unlawful acts caused by drugs, verbal and physical violence, and crimes of property.

152.    Defendants were aware of the residents' use and sale of narcotics. However, they did not act to prevent the furtherance of such unlawful acts.

153.    Upon several occasions, employees were personally involved in the residents' acts of abuse directed to Plaintiff, whether verbal or physical, because they either: (1) directly participated in an abusive act; or (2) were present during the act, and failed to intercede or call NYPD on behalf of Plaintiff, even though they had a reasonable opportunity to do so.

---

The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine.

154.   Rather, on many occasions, they watched Plaintiff being insulted, shoved, kicked, and even punched by violent, intoxicated residents.

155.   Defendants denied Plaintiff's the right to confidentiality of and access to records as provided in subparagraphs 42 U.S.C. § 10841(H) and (I) of paragraph (1)

156.   Defendant denied Plaintiff such right albeit 42 U.S.C. § 10841(2)(B) mandates that Plaintiff's access should remain applicable to records after such person's discharge from a program or facility.

157.   Invoking their clients' privacy, Defendants egregiously disregarded Plaintiff's personal and property safety by failing to report criminal acts perpetrated against him to NYPD.

158.   They outrageously disregarded Plaintiff's right to privacy by having all his personal information, including scanned medical reports stored in his computer's hard drive, stolen by drug addicts from his locker.

159.   Because of Defendants' unlawful conduct, Plaintiff has had his rights violated, whether the rights described in 42 U.S.C. § 10841 or other statutory or constitutional rights, which should be in addition to and not in derogation of those enumerated by 42 U.S.C. § 10841.

## IV.  CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(3)

160.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

161.     Defendants conspired to deprive Plaintiff, an Arab, whether directly or indirectly through the guided intimidation of Tonie Baez, DHS Senior Counsel, and Michael Yorio, Esq., OASAS Patient Advocacy Unit Manager, of the equal protection of the laws and the equal privileges under the laws. Defendants also committed the aforementioned unlawful acts in furtherance of their conspiracy whereby Plaintiff was injured in his person and property and deprived of his rights.

162.     Each defendant acting outside the scope of their employment and the duties dictated by their positions committed conspiratorial acts herein challenged.

163.     Instead of addressing Plaintiff's right to a healthy and safe environment, Defendants, merely for financial gain and petty political considerations, caused Tonie Baez and Michael Yorio, Esq., to use intimidation and coercion, resort to false representations and unlawful interference with Plaintiff's rights as a mental health patient so that he may give up asserting his rights.

31

164.    Through their conspiracy and their everlasting pattern of viperous stratagems, Defendants caused their employees to act unlawfully, deprive Plaintiff of his rights, and have him attacked and robbed on a daily basis by drug-addicted residents.

165.    Records, which Defendants, have so far denied to Plaintiff, bear some factual basis supporting Defendants' meeting of the minds. Since the first day Plaintiff began legitimately complaining, Defendants entered into an agreement, whether express or tacit, to achieve the unlawful end of getting rid of Plaintiff without addressing his complaints. Plaintiff's complaints of drug use and sale within the premises, his repeated concern of some employees letting residents smoke inside the dormitories, his reports of acts of violence, indecent sexual acts in the bathrooms, and racial harassment allegations, all these are facts plausibly suggesting the Defendants were in a situation where Plaintiff had made their business less profitable and their job more difficult. His complaints, Defendants have feared, could have possibly unveiled some acts of embezzlement.

166.    Based upon this account and the evidence that Defendants refuse to disclose, there is a meeting of the minds between Defendants or that Defendants entered into an agreement to violate Plaintiff's rights.

167.    It is also evident that the mental health reports, in which Plaintiff is diagnosed as a psychotic individual and which are signed by defendant Kedzior,  indicate such meeting of the minds.

## V.   FURTHERANCE OF CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1986

168.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

169.     Defendants, named and unnamed, including defendant Kedzior, are liable to Plaintiff because they have had knowledge of the wrongs conspired to be done in violation of 42 U.S.C. § 1985(3) or are about to be committed, and having power to prevent or aid in preventing the commission of the same, have heretofore refused so to do.

170.     Defendants could have prevented such wrongs and unlawful acts by reasonable diligence.

171.     Defendants, who are responsible of such wrongful neglect or refusal, are for the purposes of 42 U.S.C. § 1986, herein joined.

## VI.   INTENTIONAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 2000d

172.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

173.     Defendants receive federal financial assistance through the State of New York and its above-named agencies.

33

174.    Defendants discriminated against Plaintiff on the basis of race (Arab), color (White), and national origin (Moroccan).

175.    Plaintiff is a White Moroccan Arab.

176.    Defendants have known since his admission that Plaintiff is a White Moroccan Arab.

177.    As stated above, Defendants intentionally, on account of his race, color, and national origin, excluded Plaintiff from participation in, denied him the benefits of, and subjected him to discrimination under their programs or activities receiving federal financial assistance.

178.    Defendants, on account of his race, color, and national origin, discriminated against Plaintiff by excluding him from enjoying all benefits, privileges, terms, and conditions of the contractual relationship.

179.    Specifically, Defendants, on account of his race, color, and national origin, denied Plaintiff protections of his rights under HIPAA, Title V of the Mental Health Systems Act, 42 U.S.C. § 9501 *et seq.*, the Restatement of Bill of Rights for Mental Health Patients, 42 U.S.C. § 10841, Sections 1 and 4 of Article XVII of the New York State Constitution, and NYMHL §§ 33.01, 33.02, and 33.03.

180.    Defendants, on account of his race, color, and national origin,

34

denied Plaintiff medical and other records.

181.    Defendants, on account of his race, color, and national origin, denied Plaintiff immediate access to NYPD to report his stolen property.

182.    Defendants, on account of his race, color, and national origin, denied Plaintiff any participation in a police investigation.

183.    Defendants, on account of his race, color, and national origin, denied Plaintiff access to the competent agencies in order for him to report violations and criminal activity affecting his well being as a resident.

184.    Defendants, on account of his race, color, and national origin, denied Plaintiff the right to engage in protected activity.

185.    Defendants, on account of his race, color, and national origin, denied Plaintiff the right to be secure in his person and his belongings.

186.    Defendants, on account of his race, color, and national origin, denied Plaintiff their referral services to the type of permanent housing suiting his needs as a mentally balanced individual.

187.    Defendants, on account of his race, color, and national origin, disseminated evaluations and reports based upon a fraudulent diagnosis of Plaintiff, for the purpose of securing financial gain to defendant

BRC.

188.     Defendants are private actors. However, they also acted under the color of New York State law by the power vested unto them by their contracts and agreements with the State of New York.

189.     Their acts of discrimination were intentional.

190.     Discrimination was a substantial and motivating factor for Defendants' actions.

## VII.  UNLAWFUL RETALIATION UNDER 42 U.S.C. § 2000d

191.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

192.     Plaintiff participated in a protected activity by complaining of unlawful acts to the managers of defendant BRC and the Jack Ryan Residence.

193.     Plaintiff participated in a protected activity by complaining to their managers of some employees who failed to enforce the Jack Ryan Residence's internal rules.

194.     Plaintiff participated in a protected activity by complaining to their managers of some employees who showed bias and racial animus

by denying Plaintiff the right to be safe in his person and property within the confines of the Jack Ryan Residence.

195.    Plaintiff participated in a protected activity by complaining to DHS about criminal activity affecting his personal safety and the security of his property.

196.    Plaintiff participated in a protected activity by complaining to OASAS of narcotics sales and use within the premises of the Jack Ryan Residence.

197.    Defendants undertook an adverse action against Plaintiff by denying him the most basic rights under HIPAA, Title V of the Mental Health Systems Act, 42 U.S.C. § 9501 *et seq.*, the Restatement of Bill of Rights for Mental Health Patients, **42 U.S.C. § 10841**, Sections 1 and 4 of Article XVII of the New York State Constitution, and NYMHL §§ 33.01, 33.02, and 33.03.

198.    As a reprisal, Defendants, with their knowledge and connivance, had residents unlawfully access Plaintiff's locker and steal his property.

199.    In retaliation, Defendants deliberately and prematurely removed Plaintiff to another residence so that they may deny him full participation in any investigation as to the theft of his property.

200.    Although Plaintiff's move-out date was scheduled for July 15, 2013 by HPD, Defendants removed him on July 3, 2013.

201.    Plaintiff was not able to secure, as all residents do prior to their move-out date, any furniture allowance from the New York City Department of Social Services.

202.    Defendants, as professionals, know that the New York City Department of Social Services shall provide for the purchase of necessary and essential furniture, furnishings, equipment and supplies required for the establishment of a home for persons in need of public assistance like Plaintiff. 18 NYCRR § 352.7.

203.    However, they moved Plaintiff out of the Jack Ryan Residence while outrageously denying him his rights under 18 NYCRR §§ 352.7 and 352.34.

204.    Since July 3, 2013 to this day, Plaintiff slept on a bare mattress, without any sheets, pillow, or blanket.

205.    Defendants still continue to deny Plaintiff the aforementioned rights because, on or about July 10, 2013, he filed a civil rights complaint with the Office for Civil Rights, U.S. Department of Health and Human Services, complaining of the same.

206.    Acts of discriminatory harassment by both residents and employees, threats of violence, acts of violence towards Plaintiff by drug-addicted residents, who were informed of Plaintiff's complaints, the hasty removal of Plaintiff, and the theft of Plaintiff's property all

happened immediately after he began complaining to DHS and OASAS of the criminal activity within the confines of the Jack Ryan Residence – criminal activity consisting mainly of narcotics sales and use, theft, and acts of violence.

## VIII. INTENTIONAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 3604

207.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

208.    Defendants are covered by the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

209.    Defendants unlawfully discriminated against Plaintiff in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race (Arab), color (White), religion (Muslim), and national origin (Moroccan).

210.    Defendants discriminated in the rental, or otherwise made unavailable or denied, apartments to Plaintiff because of handicaps or mental illnesses, in violation of 42 U.S.C. § 3604(f)(1).

211.    They also discriminated against Plaintiff in the terms, conditions, or privileges of rental of apartments because of handicaps or mental illnesses, in violation of 42 U.S.C. § 3604(f)(2).

212.     Plaintiff is a handicapped individual. He is a White Muslim Arab Moroccan.

213.     Plaintiff spent more than two years in BRC's transitional housing residences because he signed a contract with BRC promising him to be referred to suitable permanent housing.

214.     Plaintiff was denied every opportunity to interview for suitable housing.

215.     Plaintiff is eligible and qualified to rent a suitable apartment in an assisted housing building.

216.     Yet, BRC did not make any effort, for discriminatory and retaliatory purposes to refer him to any assisted housing entity.

217.     Instead, BRC referred Plaintiff to its own property, which is a supportive housing building, where he was placed in an unfurnished room.

218.     Defendants own, operate, and manage more suitable buildings than the one to which Plaintiff was removed and which is located at 93 Pitt Street, New York, New York.

219.     Plaintiff, to this day, since July 3, 2013, has lived in this unfurnished room without furniture or cookware.

220.    In retaliation, Defendants did not advocate for Plaintiff to obtain assistance consistently with 18 NYCRR §§ 352.7 and 352.34.

221.    Defendants afforded housing opportunity and suitable assisted housing apartments remained available to other renters of a different protected class.

## IX.    INTIMIDATION, COERCION, THREATS, AND INTERFERENCE IN VIOLATION OF 42 U.S.C. § 3617

222.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

223.    In violation of 42 U.S.C. § 3617, Defendants coerced, intimidated, threatened, and interfered with Plaintiff in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by 42 U.S.C. § 3604.

224.    Plaintiff has been complaining to Defendants about their illegitimate delay of 2 years and failure in referring him to suitable housing landlords.

225.    Plaintiff complained to Defendants about his erroneous and

41

fraudulent mental health report evaluation by defendant Kedzior and how it would affect his opportunity as to being place in suitable assisted housing.

226.     As a result of his actions, Plaintiff suffered coercion, intimidation, threats, interference or retaliation.

227.     Defendants' retaliation consisted of denying Plaintiff housing opportunities and removing him to a supportive housing building where BRC is the landlord.

228.     Defendants, prior to this removal, intimidated, coerced, and threatened Plaintiff to be removed to another shelter if he does not attend an interview and sign an application for a rental in their supportive housing building located at 93 Pitt Street, New York, New York.

## X.   GROSS NEGLIGENCE

229.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

230.     By allowing the use and sale of narcotics within the premises of the Jack Ryan Residence, Defendants engaged in a conduct, which falls below the standard established by the federal, state, and local laws for the protection of Plaintiff and others against unreasonable risk of harm.

231.    Acts of tolerating narcotics, violence, and crimes of moral turpitude, of which Plaintiff has been complaining and which affected him directly, is caused by Defendants' heedlessness or inadvertence.

232.    Defendants' acts are not acceptable conduct by the standard determined through experience.

233.    They are neither acceptable to any reasonable mind.

234.    Defendants' acts constitute gross negligence because they are a failure to exercise even that care which a careless person would use.

235.    Defendant owed a duty of care to Plaintiff by Section 4 of Article XVII of the New York State Constitution.

236.    Defendant also owed a duty to protect Plaintiff and his property within the premises of the Jack Ryan Residence per NYMHL § 33.07.

237.    Defendants breached their duty.

238.    The breached duty caused physical and emotional injury to Plaintiff.

239.    On June 26, 2013, such breach caused the theft of Plaintiff's property, which is worth more than $4,060.00.

# XI.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

240.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

241.     Defendants negligently caused Plaintiff's emotional distress.

242.     Defendants, who were entrusted with the responsibility of caring for New Yorkers who are addicted to illegal substances, allowed these same New Yorkers to indulge, at the taxpayer's expense, in the use of these illegal substances.

243.     They also allowed these New Yorkers to engaged in the criminal activity of selling these illegal substances inside the premises of the Jack Ryan Residence.

244.     Moreover, evidence shows they even allowed abuse of legal drugs prescribed by defendant Kedzior.

245.     Some residents were permanently "high" on these drugs and became addicted to them.

246.     Defendants allowed violence inside the premises.

247.     Defendants hired employees, who were either convicted

44

criminals or who were drug-addicts.

248.     The above-described egregious acts fall within a pattern of extreme and outrageous conduct.

249.     By allowing this outrageous pattern of unlawful acts to happen, Defendants exposed Plaintiff to abuse, violence, and theft.

250.     By allowing these egregiously unlawful acts to happen, Defendants showed that they had intent to cause, or had reckless disregard of a substantial probability of causing, severe emotional distress to Plaintiff.

251.     Because of these outrageous acts, Plaintiff's privacy was invaded and his property was stolen.

252.     During his stay at the Jack Ryan Residence, Plaintiff was complaining to Defendants, named and unnamed, including defendant Kedzior, that the outrageous acts of being attacked by drugged residents, who consume and sell on site, is causing him severe emotional distress.

253.     Defendants, including defendant Kedzior, rejected his complaints and denied him the right to have an ambulance called.

254.     Plaintiff walked to the hospital and complained of severe pains, headaches, and stress.

45

255.    On or about June 27, 2013, Plaintiff was transported to the Beth Israel and diagnosed with several symptoms showing that he has suffered from emotional distress.

256.    Defendants' acts constitute conduct which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

## F. JURY TRIAL DEMAND

257.    Plaintiff demands a jury trial on any issue triable of right by a jury.

## G. PRAYER FOR RELIEF

258.    WHEREFORE, Plaintiff respectfully requests that this Court grant him:

(a)  Injunctive relief ending all Defendants' unlawful acts, practices, customs, and policies;

(b)  Declaratory relief;

(c)  Compensatory damages;

(d)  Liquidated damages where applicable;

(e)  Treble damages where applicable;

46

(f)   Punitive damages; and

(g)   Any other relief that this Court may deem fair, just, and equitable.

Respectfully submitted on this 20ᵗʰ day of August, 2013

By:   HICHAM AZKOUR, pro se
_____

47