## UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**Hicham Azkour**,

*Plaintiff,*

*v.*

**City of New York, New York Police Department, New York Police Department Officers 1 to 20, Detective Yuriy Posternak, Detective Luis Torres, Sergeant Philip Sansone, Special Investigator Patrick Cahill, Sergeant Gaglione, Officer Hugues, Civilian Complaint Review Board, Bowery Residents' Committee, Inc., Lawrence Rosenblatt a/k/a Muzzy Rosenblatt, Janet Forte, Tereen Llewelyn-Miller, Kevin Martin, Kristin Shilson, Kimberly Penater a/k/a Kimberly Swedenberg, Sadiqua Khabir, Angela Kedzior, Abby Stuthers, <u>Krystina de Jacq,</u> Jason Thomas, Todd Kelly, John Does 1 to 5, Jane Does 1 to 5, Pitt Street/HDFC, Rubin**, **Fiorella & Friedman LLP,**

*Defendants.*

**Civil Action No. <u>1:13-cv-05878-TPG</u>**

**Jury Trial Demanded**

---

## PROPOSED FIRST AMENDED COMPLAINT

---

## A. **NATURE OF THE ACTION**

1. Pro se plaintiff Hicham Azkour ("Plaintiff") amends his Complaint and brings the instant action for violations of 42 U.S.C. § 1981, 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, the Americans with Disabilities Act ("ADA"), and the Fair Housing Act ("FHA"). As enumerated below, Plaintiff brings claims for violations of statutory and constitutional rights against (1) the City Defendants, (2) the BRC Defendants, and (3) the Law Firm Defendants. In addition, Plaintiff brings common law and tort claims against the above-captioned defendants.

2. Claims are brought against the individual City Defendants both on their individual and official capacities.

3. Claims are brought against the individual BRC Defendants both on their individual and corporate/official capacities.

## B. **HEIGHTENED STANDARD OF PLEADING**

4. Plaintiff articulates his allegations *with particularity* because some of his claims are premised on allegations of fraud and, therefore, need to satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

5. The present First Amended Complaint lays Plaintiff's allegations, *at length and with the utmost particularity*, because it specifies the defendants'

statements, reports, or acts Plaintiff contends to be fraudulent; it respectively identifies the speakers and the authors of said statements, reports, or acts; and it states where and when the statements were made, the reports were created, and the acts were committed; and it explains why the statements, reports, or acts were fraudulent.

6.  Plaintiff's claims, which are not premised on allegations of fraud, are herein articulated as short and plain statements, meeting thus the requirements of Federal Rule of Civil Procedure 8(a).

## C. PARTIES

### I.      Plaintiff

7.  Plaintiff is an adult individual who currently resides at 93 Pitt Street, New York, New York.

8.  Plaintiff is mentally sable and competent by *the weight of clinical evidence*. Prior, during, or following the events set forth below, Plaintiff has never suffered from any mental disability as defined by § 1.03.3 of the New York Mental Hygiene Law ("NYMHY"). The latter defines mental disability as mental illness, intellectual disability, developmental disability, alcoholism, substance dependence, or chemical dependence.

9.  Prior to his referral and domiciliation at the above-referenced address, Plaintiff was a homeless individual as defined by 42 U.S.C. § 11302 and 18

N.Y.C.R.R. § 800.2(i).

## II.    BRC Defendants

10. Defendant Pitt Street/HDFC is Plaintiff's current landlord. Following referral by defendant Bowery Residents Committee, Inc. ("BRC"), defendant Pitt Street/HDFC entered with Plaintiff into a stabilized-rent, one-year, renewable contract on July 15, 2013. Defendant Pitt Street/HDFC operates the Los Vecinos Single Occupancy Rooms ("Los Vecinos") located at 93 Pitt Street, New York, New York, where Plaintiff has been residing since July 3, 2013.

11. The Federal Section 8 Program covers payment of Plaintiff's rent at Los Vecinos as per 24 C.F.R. Part 5, Subpart F, and 42 U.S.C. § 1437a.

12. Los Vecinos dwelling units are a Section 11 supportive housing Federal program for persons with disabilities as defined by 42 U.S.C. § 8013 and 24 C.F.R Part 891, Subpart C.

13. Upon information and belief, defendant BRC and its entity Pitt Street/HDFC are owners of the above-name Section 11 supportive housing dwelling units. *See* 24 C.F.R. § 891.305.

14. Both defendant BRC and defendant Pitt Street/HDFC, as owners within the meaning of 24 C.F.R. § 891.305, are mandated by 42 U.S.C. § 8013(j)(2) to comply and certify to the satisfaction of the Secretary of the U.S.

Department of Housing and Urban Development ("HUD"), that assistance made available under their Section 11 program, i.e., Los Vecinos, is conducted and administered in conformity with title VI of the Civil Rights Act of 1964, the Fair Housing Act and other Federal, State, and local laws prohibiting discrimination and promoting equal opportunity.

15. Los Vecinos are dwelling units whose purpose, as per 42 U.S.C. § 8013(a), is *strictly* for the accommodation of persons with disabilities and development disabilities, as respectively defined by 42 U.S.C. § 8013(k)(2) and 42 U.S.C. § 15002(8).

16. Defendant BRC is a not-for-profit corporation organized under Federal laws and regulations. *See, e.g.,* 24 C.F.R. § 891.305. Defendant BRC is also respectively defined as a not-for-profit organization and contractor by Sections 42(4) and 43 of the New York Social Services Law. *See also* 18 N.Y.C.R.R. § 800.2(e).  At all times relevant, as set forth below, BRC has been operating the Boulevard Residence and the Jack Ryan Residence, which are homeless shelters or homeless projects, as defined by 18 N.Y.C.R.R. § 800.2(k).

17. The Boulevard Residence and the Jack Ryan Residence are facilities acquired, constructed, renovated or rehabilitated and operated by defendant BRC to increase the availability of housing for homeless persons. Said

facilities include non-housing services such as, but not limited to dining, recreation, sanitary, social, medical and mental disability services.

18. Upon information and belief, at all times relevant to the present matter, defendant BRC has provided services for persons with a mental disability. As defined by NYMHY §1.03.4, "services for persons with a mental disability" means examination, diagnosis, care, treatment, rehabilitation, supports, habilitation or training of the mentally disabled.

19. Defendant BRC is a care provider as defined by NYMHY §1.03.5.

20. Upon information and belief, and at all times relevant to the present matter, said facilities are also mental health facilities as defined by NYMHY §1.03.6.

21. Upon information and belief, Los Vecinos dwelling units constitute a supportive living residence as defined by NYMHY §1.03.28-b. These units constitute a community residence providing practice in independent living under supervision but not providing staff on-site on a twenty-four hour per day basis.

22. Defendant BRC is an entity covered by the Privacy Rule of the Health Insurance Portability and Accountability Act ("HIPAA"), as regulated by 45 C.F.R. Part 160 and Subparts A and E of Part 164.

23. Defendant BRC is an entity covered by NYMHY § 33.16 relative to a

client's right to access his or her clinical records.

24. Defendant BRC is mandated by NYMHY § 33.25 to release a client's records pertaining to allegations and investigations of abuse and mistreatment.

25. At all times relevant to the instant matter, defendant Angela Kedzior has been a New York State licensed psychiatrist. She has been the *only* BRC physician and director supervising *all* BRC clinical staff and *all* BRC programs. Defendant Angela Kedzior is a "licensed physician" as defined by NYMHY §1.03.8.

26. Defendant Abby Stuthers is defendant BRC's registered nurse at the Boulevard Residence. Upon information and belief, and at all times herein relevant, she has worked under the supervision of defendant Kedzior.

27. Defendant Krystina de Jacq is defendant BRC's registered nurse at the Jack Ryan Residence. Upon information and belief, and at all times herein relevant, she has worked under the supervision of defendant Kedzior.

28. Defendant Mary Gray is defendant BRC's registered nurse at the Jack Ryan Residence. Upon information and belief, and at all times herein relevant, she has worked under the supervision of defendant Kedzior.

29. Defendant Lawrence Rosenblatt a/k/a Muzzy Rosenblatt is the Executive Director of defendant BRC.

30. Upon information and belief, defendant Kevin Martin is a BRC Deputy Executive Director.

31. Defendant Janet Forte is the Director of defendant BRC's Jack Ryan Residence, which is located at 131 West 25th Street, New York, New York.

32. Defendant Tereen Llewelyn-Miller is the Assistant Director of defendant BRC's Jack Ryan Residence.

33. Upon information and belief, defendant Jason Thomas is a Shift Supervisor at the Jack Ryan Residence.

34. Upon information and belief, defendant Todd Kelly is a Site Coordinator at the Jack Ryan Residence

35. Defendant Sadiqua Khabir is a BRC Deputy Executive Director. Upon information and belief, she supervises the operation and management of Los Vecinos.

36. Defendant Kimberly Penater a/k/a Kimberly Swedenberg is the current Section 811 Program Director and former Clinical Supervisor of Los Vecinos.

37. Defendant Kristin Shilson is the former Section 811 Program Director of Los Vecinos.

38. Defendant Brittany Nicholson is the current Clinical Supervisor of Section 811 Program at Los Vecinos.

39. All the above-named individual defendants are BRC employees with supervisory authority.

40. Defendants John Does 1 to 5 and Jane Does 1 to 5 are unidentified individual BRC employees.

41. All the above-named and unnamed individual defendants have the authority to end the unlawful allegations of discrimination and other alleged local, state, and Federal violations within the premises of the above-named facilities.

42. All the above-named and unnamed individual defendants have the authority to admit residents and/or tenants into the above-named facilities and discharge them in accordance and in compliance with Federal, state, and local laws.

43. All the above-named and unnamed individual defendants have the authority to enforce the internal rules within the premises of the above-named facilities.

44. All the above-named and unnamed individual defendants have the authority and duty to report criminal or unlawful acts, which occur within the premises of the above-named facilities, to the Federal, state, and local authorities.

45. All the above-named and unnamed individual defendants are required to

abide by and implement the laws, rules, and regulations of the Federal, state, and local agencies licensing them to operate the above-described programs.

46. All the above-named and unnamed individual defendants created policies or customs under which unlawful practices occurred and allowed such policies or customs to continue.

### III.    City Defendants

47. The City of New York ("NYC") is a municipal corporation organized under the laws of the State of New York. At all times relevant herein, defendant NYC, acting through defendant New York Police Department ("NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times herein relevant, defendant NYC was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

48. Defendant NYPD, as defendant NYC's law enforcement agency, receives Federal assistance.

49. Defendants NYPD Officers 1 to 20 are or were, at all relevant times relevant herein, police officers, sergeants, lieutenants, and/or captains employed by

NYPD and the City of New York.

50. Upon information and belief, Detective Yuriy Posternak who, according to defendant Nicholson, also introduced himself, on December 15, 2015, to be an agent of the Federal Bureau of Investigation ("FBI"), is an NYPD Intelligence Division & Counter-Terrorism Bureau detective.

51. Upon information and belief, Detective Luis Torres who, according to defendant Nicholson, also introduced himself, on December 15, 2015, to be an FBI agent, is an NYPD Intelligence Division & Counter-Terrorism Bureau detective.

52. Upon information and belief, defendant Sergeant Philip Sansone is an investigator from the Intelligence Bureau Investigations Unit of the NYPD Intelligence Bureau DHS Security Liaison.

53. Upon information and belief, defendant Patrick Cahill is a Special Investigator from the Office of the Inspector General for NYPD, NYC Department of Investigations. Upon information and belief, this department is authorized to investigate, review, study, audit and make recommendations relating to the operations, policies, programs and practices of NYPD, with the goal of enhancing the effectiveness of NYPD, increasing public safety, protecting civil liberties and civil rights, and increasing the public's confidence in the police force.

54. Upon information and belief, defendant Civilian Complaint Review Board ("CCRB") is an "independent" city agency, with subpoena power. It is not part of NYPD. Defendant CCRB handles complaints about excessive force, abuse of authority, offensive language, and discourtesy.

55. Upon information and belief, defendant Gaglione, Shield # 25144, is a sergeant from the NYPD 7th Precinct.

56. Upon information and belief, defendant Hughes, Shield # 6507, is an officer from the NYPD 7th Precinct.

57. The named NYPD individual defendants and the unnamed defendants NYPD Officers 1 to 20 are jointly and severally sued, both in their individual and official capacities.

58. At all times relevant herein, the named NYPD individual defendants and the unnamed defendants NYPD Officers 1 to 20 were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. Defendants were acting for and on behalf of NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the New York Police

Department.

59. At all times relevant herein, the above-named NYPD individual defendants and defendants NYPD Officers 1 to 20 violated clearly established constitutional standards under the First, Fourth, and Fourteenth Amendments to the United States Constitution of which a reasonable police officer and/or public official under their respective circumstances would have known.

60. The unlawful acts under the color of law, hereafter complained of, were carried out intentionally, recklessly, with malice and/or gross disregard for Plaintiffs' rights.

### IV.   <u>Law Firm Defendants</u>

61. Defendant Rubin, Fiorella, and Friedman LLP, is a New York law firm. All attorneys and partners, without exception, who were and are employed by this firm since the outset of the present action, are named as individual defendants. The term "The Law Firm Defendants" include said individual attorneys. At all times relevant herein, this firm and its attorneys, whether named or unnamed, have been authorized to practice law in New York and have represented the above-named and unnamed BRC Defendants since the initiation of the present matter in September 2013.

62. Defendant Rubin, Fiorella, and Friedman LLP is an active domestic limited liability partnership registered with the New York State Department of State,

Division of Corporations, under DOS ID # 2520523.

63. Attorneys of defendant Rubin, Fiorella, and Friedman LLP are severally and jointly sued in their individual capacities.

## D. NOTICE OF CLAIM

64. Within 90 days of the last violation of his rights by the City Defendants, Plaintiff filed a written Notice of Claim with the New York City Office of the Comptroller. More than 30 days have elapsed since the filing of that notice, and this matter has not been settled or otherwise disposed of.

## E. JURISDICATION AND VENUE

65. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1343, and 1367.

66. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391.

## F. FACTUAL ALLEGATIONS

67. On or about December 8, 2010, Plaintiff was evicted from his apartment, which was located at 21-11 23rd Street, Astoria, New York.

68. Plaintiff was evicted due to his inability to pay rent following his unemployment, which was caused by a retaliatory and discriminatory termination by his former employer Little Rest Twelve, Inc.

69. Plaintiff was referred to the Bellevue men's shelter, an assessment facility of the New York City Department of Homeless Services ("DHS"), which is

located at 400 East 30th St, New York, New York.

70. On or about June 9, 2011, Plaintiff, following more than two months of assessment by the DHS staff at the Bellevue men's shelter, was referred to his permanent shelter at the BRC's Boulevard Residence, a 101-bed men's shelter located at 2270 Lexington Avenue, New York, New York.

71. During his stay at the Boulevard Residence, defendant Stuthers falsely and fraudulently represents that, with the collaboration of defendant Kedzior, she examined and diagnosed Plaintiff, on or about July 18, 2011, with post-traumatic stress disorder, alcohol dependence in full remission, and generalized anxiety disorder.

72. No medical examination of Plaintiff had ever occurred on or about July 18, 2011.

73. The above-reported mental ailments, which are falsely attributed to Plaintiff, are fraudulent misdiagnoses establishing an alleged disability for the purposes of fraudulently meeting the requirements set by 42 U.S.C. § 8013 and 24 C.F.R. Part 891, Subpart C.

74. Defendant Stuthers falsely and fraudulently reported in her July 18, 2011 psychiatric report that Plaintiff had been suffering from a head trauma.

75. Plaintiff did not complain to defendant Stuthers or defendant Kedzior of any head trauma because he had never been subjected to any such injury.

76. There is no extant medical record that has ever diagnosed Plaintiff as having experienced or suffered from head trauma.

77. Based on a psychiatric report, which was obtained by Plaintiff following his complaint to the U.S. Department of Health and Human Services ("HHS") for HIPAA Privacy Rule violations by defendant BRC, defendant Stuthers issued said misdiagnoses on July 18, 2011 with the alleged collaboration of defendant Kedzior.

78. On July 18, 2011, Plaintiff had a brief, casual conversation with defendant Stuthers at the Boulevard Residence. The conversation lasted less than 5 minutes.

79. The clinical information set forth in the psychiatric assessment does not truthfully reflect the statements made by Plaintiff during his conversation with defendant Stuthers.

80. Defendant Kedzior was not present during the July 18, 2011 meeting and any reference by defendant Stuthers to defendant Kedzior's collaboration to the psychiatric assessment is a fraud.

81. Defendant Stuthers did not clinically examine Plaintiff. Nor did defendant Kedzior.

82. At no time during said conversation or meeting with defendant Stuthers did Plaintiff state to her that he had been suffering from a mental illness or a

disability.

83. At no time during said conversation or meeting with defendant Stuthers was Plaintiff, whether formally or informally, informed that he was the subject of a psychiatric evaluation.

84. Prior to her request for a meeting, defendant Stuthers informed Plaintiff that the meeting was strictly about permanent housing referral.

85. At the end of the meeting, defendant Stuthers prescribed medication to Plaintiff and, to his utmost surprise, handed him a medical prescription note.

86. Plaintiff then stated to defendant Stuthers that he was not ill and did not need any medication at all.

87. However, she deceivingly informed him that the prescribed medication was *strictly* intended to help him sleep in the noisy Boulevard Residence.

88. Specifically, Defendant Stuthers prescribed Cymbalta 30 mg to Plaintiff.

89. Cymbalta, among others, is the brand name for duloxetine, which is a serotonin-norepinephrine reuptake inhibitor ("SNRI"). It is usually prescribed for major depressive disorder, generalized anxiety disorder, fibromyalgia and neuropathic pain.

90. The Federal Drug Administration ("FDA") has officially expressed concerns regarding liver toxicity caused by Cymbalta.

91. By reporting that Plaintiff allegedly suffered from alcohol dependence, which has a substantial impact on the liver, and her prescription of Cymbalta, which has been proven to cause liver toxicity, defendant Stuthers showed a deliberate departure from good and accepted medical practice.

92. At all times relevant herein, Plaintiff has never suffered from any alcohol dependence.

93. Although he is not dependent on any chemical substance, whether legal or illegal, the Human Resources Administration, City of New York, required, pursuant to 42 U.S.C. § 608, that Plaintiff enroll in and successfully graduate from a substance abuse prevention program in order for him to receive Temporary Assistance for Needy Families.

94. Plaintiff enrolled in and successfully graduated from a substance abuse prevention program on October 4, 2011.

95. At all times relevant herein, Plaintiff has never tested positive to any legal or illegal substance.

96. Even though Plaintiff informed the clinical staff at the Boulevard Residence that he did not need any medication, he was administered Cymbalta on a daily basis under the threat of being denied a bed and being discharged.

97. Prior to the HHS determination resolving Plaintiff's HIPAA complaint, which was issued on December 16, 2014, Plaintiff had never been provided

with any official copy of defendant Stuthers psychiatric assessment.

98. The BRC Defendants, following the HHS determination however, finally agreed to provide Plaintiff with his medical records on March 3, 2015.

99. To this day, notwithstanding, the BRC Defendants, including defendant Kedzior and defendant Penater, refuse to provide Plaintiff with a report and certification, allegedly signed by defendant Kedzior, which was submitted to the Mount Sinai physicians and to defendant NYPD Sergeant Gaglione, on or about January 6, 2015, for the purpose of hospitalizing Plaintiff on the malicious misrepresentations and false accusations of threats of violence and physical harm to both staff and residents.

100.    Unexpectedly, on September 9, 2011, Plaintiff was transferred and admitted to the Jack Ryan Residence.

101.    In the Jack Ryan Residence, upon numerous times, Plaintiff was compelled to visit defendant Krystina de Jacq in her office.

102.    During those short visits, which did not usually exceed ten minutes, defendant de Jacq used to spend most of her time practicing her French skills before Plaintiff and asking him questions about his stay in France.

103.    Plaintiff began then explicitly questioning defendant de Jacq's unprofessional conduct and the purpose of his visits.

104.    Defendant de Jacq never stated to Plaintiff that he was the subject of

a psychiatric examination.

105.     She never asked him any questions regarding his medical history.

106.     Nevertheless, the psychiatric evaluation defendant de Jacq issued on

February 15, 2012 indicates that, within approximately 5 months, Plaintiff's

post-traumatic stress disorder was downgraded to major depressive disorder

with and/or without psychotic features.

107.     Defendant de Jacq's report does not provide any clinical explanation

to such a swift change in Plaintiff's alleged mental illness.

108.     Whereas Plaintiff never conversed with defendant de Jacq more than

ten minutes for each time he was compelled to meet her, she nevertheless

misrepresented in her so-called psychiatric evaluation that she clinically

examined Plaintiff for 135 minutes with the collaboration of defendant

Kedzior.

109.     Defendant Kedzior was never present during the above-mentioned

brief meetings.

110.     Most of the information reported in defendant de Jacq's so-called

evaluation is a set of inventions, contradictions, misrepresentations, and

distortions of Plaintiff's innocent and truthful statements to her during their

meetings.

111.     For instance, while Plaintiff is not a smoker and was not a smoker at

the time of the February 15, 2012 report, defendant de Jacq's report misrepresents that Plaintiff stated to her he smoked only when he had money.

112.    As indicated at the beginning of the February 15, 2012 report, i.e., "it's going bad, just the fact of being here," defendant de Jacq maliciously built an entirely fraudulent misdiagnosis around this very simple statement, which was falsely attributed to Plaintiff and where he seemed to peacefully protest his condition of homelessness.

113.    Plaintiff does not deny that he had complained about the conditions of his living in a homeless shelter to the BRC Defendants, including defendant de Jacq and defendant Stuthers.

114.    The BRC Defendants and their practitioners have denied that Plaintiff's complaints as to his condition in the homeless shelter constitute evidence of his full awareness and sound mental faculties.

115.    To create a record of mental disability, they purposefully interpreted his complaints as threats, hallucinations, paranoia, delusions, and an utter disconnection from reality.

116.    Defendant de Jacq and defendant Stuthers, along with all BRC Defendants, have always misperceived Plaintiff's homelessness and complaints as a mental disability.

117.    Departing from standard and acceptable medical practice, defendant de Jacq's so-called psychiatric evaluation contains incomprehensible phrases and sentences in the French language, which are falsely attributed to Plaintiff.

118.    Plaintiff did not speak French to defendant de Jacq during his visits.

119.    On February 15, 2012, defendant de Jacq, in the absence of any actual diagnosis, which ought to be based on the existence of a discernable and a clinically proven mental illness, and in an ostensible departure from good and acceptable medical practice, prescribed to Plaintiff, against his will, medication that consists of Lexapro 10 mg.

120.    Plaintiff stated to defendant de Jacq that he was not ill and that he would refuse to be administered medication.

121.    Defendant de Jacq explicitly threatened Plaintiff that he would be discharged and reported to DHS if he refused to take his medication.

122.    Under the supervision of unqualified and uncertified clinical staff at the 6th Floor of the Jack Ryan Residence, the BRC Defendants compelled Plaintiff to take Lexapro 10 mg on a daily basis.

123.    As a result of the coercive and unlawful character of the BRC Defendants' acts, Plaintiff complained to Miriam Castro, who was then the Assistant Director of the Jack Ryan Residence, and informed her that albeit

he was mentally stable, he had been misdiagnosed with an unspecified mental illness and compelled to take medication.

124.     Plaintiff complained to Miriam Castro that such misdiagnoses, if reported to the New York State Office of Mental Health ("OMH"), would harm him professionally and cause his rights to be violated.

125.     Indeed, the BRC Defendants reported and caused to be reported to OMH such fraudulent misdiagnoses and have thus caused, whether directly or otherwise, substantial harm to Plaintiff.

126.     Miriam Castro who, based upon her objective observations, was dumbfounded and rejected the BRC Defendants' misperception that Plaintiff was mentally ill or disabled.

127.     She urged Plaintiff to seek a second medical opinion and referred him to the Westside Clinic of the Postgraduate Center for Mental Health ("PCMH").

128.     Following a few sessions with a psychotherapist at the above-named clinic and her recommendations, a PCMH psychiatrist discontinued the Lexapro 10 mg and determined that Plaintiff was fully stable.

129.     Despite the PCMH clinical determination, the BRC Defendants continued, based upon unlawful grounds, to perceive Plaintiff as a mentally disabled individual and threatened him, upon several occasions, with

involuntary hospitalization and discharge if he refused to be administered his Lexapro 10mg.

130.    On August 27, 2012, after Plaintiff had begun consistently voicing his peaceful protests, the BRC Defendants compelled Plaintiff to visit defendant Mary Gray.

131.    During the brief time of their meeting, Plaintiff refused to speak with defendant Gray.

132.    So, on the same day, defendant Gray issued a psychiatric evaluation where she misrepresents that she examined Plaintiff and diagnosed him with alcohol dependence and major depressive disorder with psychotic features.

133.    These ailments were again crowned with post-traumatic stress disorder – a disorder already discarded by defendant de Jacq in her February 15, 2012 report.

134.    Although she had knowledge that Plaintiff had been determined to be mentally stable by the PCMH psychiatrist and psychotherapist, defendant Gray recommended that Plaintiff be prescribed anti-psychotic medication to treat "paranoid & delusional preoccupations."

135.    Curiously, whereas she was indisputably permitted by New York law to prescribe anti-psychotic medication herself, without defendant Kedzior's prior approval, defendant Gray did not do it because she was aware that her

evaluation was a fraudulent misdiagnosis and that Plaintiff did not suffer from any form of delusion or paranoia.

136.     As a licensed nurse, defendant Gray was aware that administration of anti-psychotic medication was tremendously harmful and could cause, in Plaintiff's case, irreversible damage.

137.     Defendant Kedzior did not prescribe anti-psychotic medication to Plaintiff because, contrary to defendant Gray's misrepresentations, she did not collaborate with defendant Gray or met her to discuss Plaintiff's mental health.

138.     As per her own admission to Plaintiff on July 3, 2013, defendant Kedzior was not aware of the above-mentioned meeting.

139.     The inconsistent misdiagnoses herein related demonstrate that BRC's mental health practitioners departed from the medical standard practice.

140.     The misdiagnoses were fraudulent for the sole purpose to meet disability requirements for permanent housing.

141.     The unprofessional and destructive psychiatric evaluations generated by defendant BRC's practitioners had no other purpose but to create a record of disability enabling them to place Plaintiff, at any cost, in a supportive housing building, such as Los Vecinos.

142.     During his long stay at the Jack Ryan Residence, Plaintiff was never

referred to any suitable, permanent housing for mentally competent and stable individuals.

143.    The only referral occurred on or about February 8, 2013. Plaintiff was then referred to the Section 811 program at Los Vecinos and was interviewed by defendant Shilson and defendant Penater.

144.    While being interviewed by defendant Shilson and defendant Penater, they never *explicitly* informed Plaintiff that Los Vecinos is a "harm reduction" facility *strictly* designed for individuals who suffer from debilitating physical, mental, and developmental impairments, including chemical addiction.

145.    At no time during the interview, or thereafter, did defendant Shilson, defendant Penater, or the BRC Defendants informed Plaintiff that Los Vecinos *is not* a residence for fully stable and functional tenants.

146.    During the interview, defendant Shilson and defendant Penater misrepresented to Plaintiff that Los Vecinos is a smoke-free and drug-free facility.

147.    Following the interview, the BRC Defendants required that Plaintiff accept the housing offer at Los Vecinos or be reported to DHS and the New York State Office of Temporary and Disability Assistance ("OTDA").

148.    The BRC Defendants were threatening to discharge Plaintiff because

they were abusing the OTDA regulations.

149.     Specifically, the BRC Defendants were abusing <u>Directive No. 94</u> <u>ADM-20</u> by intimidating Plaintiff and threatening him with discharge when he questioned their abusive practices of discrimination, retaliation, fraud, medical malpractice, and negligence[1].

150.     Such acts of intimidation became more deranging as Plaintiff started complaining of his exposure to secondhand smoke and narcotics

151.     Whereas the use of tobacco, alcohol, and narcotics is strictly prohibited by New York and Federal laws in transitional housing, such as the Jack Ryan Residence, the BRC Defendants adopted what they dubbed a "harm reduction" policy and allowed all types of addictive behavior inside the Jack Ryan Residence.

152.     The BRC Defendants explicitly encouraged the use of tobacco, alcohol, and narcotics *inside* the Jack Ryan Residence as a measure to prevent their use *outside* the Residence and cause the neighbors' incessant complaints.

153.     The BRC Defendants and the Jack Ryan Residence were then sued by their neighbors because of their residents' acts of harassment, sexual harassment, assault, theft, public intoxication, use of alcohol and narcotics,

---

[1] *See* **http://otda.ny.gov/policy/directives/1994/ADM/94_ADM-20_updated96.pdf**

excessive noise, and disorderly conduct.

154.     At all times relevant, the "harm reduction" policy contributed to an increase in thefts, acts of violence, health hazards, and harassment inside and outside the Jack Ryan Residence and Los Vecinos.

155.     The "harm reduction" policy is discriminatory and has caused tremendous harm to Plaintiff and to all residents who were not using illegal or legal chemical substances.

156.     The BRC Defendants have devised a policy consisting of abusing the "harm reduction" concept by avoiding placement of their visibly intoxicated and addicted residents in detoxification centers, causing thus physical injury and health hazards to residents such as Plaintiff.

157.     Plaintiff was harassed and physically attacked by intoxicated residents demanding money to meet their drug needs.

158.     Plaintiff complained of such violations to DHS and the New York State Office of Alcoholism and Substance Abuse Services ("OASAS").

159.     Plaintiff also complained to DHS and OASAS of the BRC Defendants' discriminatory policies, which have a disparate impact upon individuals, such as Plaintiff.

160.     The BRC Defendants refused to and were confident to not take any remedial action because they caused the above-mentioned agencies to

determine that Plaintiff was mentally impaired and his complaints were the result of his alleged paranoia, delusions, and hallucinations.

161.     Following this protected housing activity, the BRC Defendants increased the frequency of their retaliatory and adverse actions by having their staff incite the intoxicated residents to carry out more acts of physical violence and harassment against Plaintiff.

162.     Plaintiff, on the watch of the BRC staff, some of whom were former convicted felons, was abused by the intoxicated residents and hurled with racial slurs because of his religion as a Muslim and his race as an Arab.

163.     While denying Plaintiff any protection, the BRC staff promptly interfered and stopped hostilities against residents of other protected classes.

164.     On or about June 26, 2013, this pattern of abuse and harassment culminated in Plaintiff's property being stolen from inside his locker, most certainly on the watch and with the help of the BRC staff.

165.     Plaintiff immediately reported the theft – a grand larceny – to NYPD by using his cell phone.

166.     The responding NYPD Officers received Plaintiff's complaint and filed a police report.

167.     However, on or about April 28, 2014, defendant Todd Kelly and defendant Jason Thomas committed perjury, after being advised by the Law

Firm Defendants, by executing two sworn affidavits and misrepresenting to this Court that Plaintiff had never called NYPD or filed a police report immediately following the theft of his property.

168.    Plaintiff produced to this Court a police report that contradicts defendant Todd Kelly's and defendant Jason Thomas' testimony.

169.    The BRC Defendants interfered with the NYPD investigation and falsely represented to the responding NYPD Officers that Plaintiff was suffering from hallucinations and chronic paranoid schizophrenia and that no theft had ever occurred.

170.    Exercising their sound judgment, the responding NYPD Officers were aware that the BRC Defendants' statements were misrepresentations and informed Plaintiff of such malicious misrepresentations.

171.    Plaintiff would later learn from the responding NYPD Officers that defendant Tereen Llewelyn-Miller and defendant Janet Forte, denied the responding NYPD Officers immediate access to the video footage captured by the security cameras of the Jack Ryan Residence.

172.    While denying the responding NYPD Officers and detectives any help to promptly conduct an efficient investigation, defendant Tereen Llewelyn-Miller conducted a sham internal investigation, which consisted of asking the residents, in the presence of Plaintiff, to open their lockers and state

whether they had his stolen property therein.

173.    Defendant Llewelyn-Miller's sham investigation was intended to cause incitement and create a hostile housing environment where the residents would attack Plaintiff thereafter.

174.    In addition, the BRC Defendants' sham investigation and how it proceeded proves that the BRC Defendants misperceived Plaintiff as a mentally deficient individual who would be easily deceived.

175.    Obviously, their sham investigation did not reach any conclusion and, in violation of NYMHY § 33.25, the BRC Defendants have heretofore refused to release to Plaintiff, following his explicit and written requests, records pertaining to the above-mentioned investigation and other investigations of abuse and mistreatment.

176.    Since he was admitted to the Jack Ryan Residence on or about September 9, 2011, Plaintiff was subjected to psychological, verbal, and physical abuse. He was subjected to assault and theft from BRC clients, all on the watch of BRC staff and knowledge of the BRC Defendants.

177.    Defendant Lawrence Rosenblatt was aware of such abuse and directly witnessed several attacks against Plaintiff by other residents in the Jack Ryan Residence's dining room.

178.    He took no remedial action.

179.    Plaintiff had a couple of meetings with defendant Janet Forte and defendant Kevin Martin to put an end to the above-described hostile housing environment. However, these managers did not take any action to end such extremely pervasive and hostile environment.

180.    Instead, as reported above, they maliciously engaged in discriminatory and retaliatory acts to intimidate Plaintiff and drive him away from the Residence.

181.    Other residents, who are not of Plaintiff's protected class, were protected and treated fairly and, if any unlawful acts were committed or about to be committed against them, BRC staff would intervene promptly to enforce the Residence's internal rules or call NYPD to report any unlawful, harmful activity.

182.    All the egregious conduct enumerated above, whether intentionally or negligently inflicted by the BRC Defendants, caused substantial emotional distress upon Plaintiff and led to his voluntary hospitalization on or about June 27, 2013.

183.    After his discharge from the hospital and return to the Jack Ryan Residence, Plaintiff was informed by defendant BRC's staff that he was scheduled to move out on July 15, 2013 to Los Vecinos.

184.     Without prior notice, on July 3, 2013, Plaintiff was escorted to defendant Kedzior's office.

185.     Defendant Kedzior informed Plaintiff that she was to authorize his removal to Los Vecinos because he had caused "many problems" to defendant BRC.

186.     On July 3, 2013, defendant Kedzior, whom Plaintiff officially met for the first time, signed and certified the paperwork allowing the BRC Defendants to definitively place Plaintiff at Los Vecinos, a Section 811 program for the mentally disabled individuals.

187.     On July 3, 2013, Plaintiff was transported with his belongings to Los Vecinos.

188.     Plaintiff was assigned a room without furniture.

189.     The rental agreement signed by Plaintiff and defendant Pitt Street/HDFC indicates that Plaintiff was scheduled to move in to Los Vecinos on July 15, 2013.

190.     HUD documents also indicate that the Section 8 rent payments started on July 15, 2013.

191.     During the first day of his stay at Los Vecinos, Plaintiff noticed that residents smoke cigarettes and marijuana in the hallway. He also noticed that his neighbor at #3C, Mr. Vernon Reed, drank alcohol in the kitchen and was,

upon numerous occasions, drunk, half-naked, obnoxious, and unable to stand upright and walk.

192.   A few days later, Plaintiff noticed that Mr. Reed was receiving the visit of up to 10 male individuals within one day.

193.   A resident informed Plaintiff that Mr. Reed was using his room for male prostitution.

194.   The activity, noise, and smell emanating from #3C was intolerable and confirmed said resident's allegations.

195.   Although defendant Shilson and defendant Penater represented to Plaintiff that Los Vecinos is a smoke-free and drug-free building, Plaintiff, a non-smoker, had to endure the smoke traveling from #3C to his room.

196.   Plaintiff was suffocating and injured by secondhand smoke

197.   When Plaintiff complained of secondhand smoke, defendant Shilson unscrupulously directed him to take a walk each time he would feel that smoke was drifting to his room.

198.   When Plaintiff reminded her that such statement was irresponsible and constitutes a violation of the New York City Smoke-Free Air Act of 2002, she asked him to leave her office or she would call the police.

199.   Defendant Shilson used to consider Plaintiff's complaints or concerns as a form of harassment.

200.     Anyway, secondhand smoke drifts to Plaintiff's room because the Los Vecinos building does not comply with the requirements of the HUD regulations relative to the physical condition of buildings. *See, e.g.,* 24 C.F.R. § 5.703.

201.     The "walls" that separate Los Vecinos dwelling units are not structurally sound, free of health and safety hazards, functionally adequate, as prescribed by 24 C.F.R. § 5.703(d). In fact, said "walls" are parallel thin sheets of plywood, which are not sound proof and within which rodents live.

202.     They constitute also a fire hazard.

203.     The Los Vecinos hazardous structure allows said rodents to get into Plaintiff's room. This non-compliant structure also exposes him to the daily smell of narcotics smoked by both his neighbors at #3A and #3C. Moreover, it exposes him to their excessive noise.

204.     Plaintiff was not intimidated by defendant Shilson and continued to peacefully complain to her of these substandard housing conditions and all the nuisances to which he was subjected.

205.     Defendant Shilson ignored Plaintiff' complaints and further countered them with acts of intimidation and coercion.

206.     Being informed by defendant Shilson of Plaintiff's complaints, Mr. Reed became extremely hostile and started overtly harassing Plaintiff by

causing excessive noise and by leaving his door wide open while smoking his synthetic marijuana, whose stench was asphyxiating Plaintiff inside his room.

207.    One day, without being provoked, Mr. Reed assaulted Plaintiff and threatened to stab him with a knife.

208.    Plaintiff heard Mr. Reed, who is an African-American homosexual, stating to another resident that he would kill Plaintiff because he was a racist and a homophobe.

209.    Plaintiff complained to defendant Shilson of Mr. Reed's unlawful acts of harassment, intimidation, coercion, and interference with his housing rights.

210.    Again, defendant Shilson ignored Plaintiff's complaints and the seriousness of Mr. Reed's unlawful acts.

211.    Each time Plaintiff complained of Mr. Reed's violent acts, defendant Shilson and defendant Penater threatened to commit Plaintiff to a psychiatric hospital.

212.    Defendant Shilson and defendant Penater stated to Plaintiff that nobody had ever harmed him, that he was "struggling with voices", and that he just felt "persecuted by the entire building."

213.     Undeterred, Mr. Reed continued to verbally harass and physically assault Plaintiff. He also continued to engage in the illicit activity of using narcotics, smoking and drinking inside and outside his room, and operating his prostitution business on the watch of defendant Shilson and defendant Penater.

214.     These unlawful acts are proscribed by 24 C.F.R. Part 982, Subpart L and, in principle, should have subjected Mr. Reed to lease termination and eviction[2].

215.     42 U.S.C § 13662 mandates termination of tenancy and assistance for illegal drug users and alcohol abusers in federally assisted housing, such as Los Vecinos.

216.     Mr. Reed's addiction to drugs, as fully described below, led him to commit more criminal acts against Plaintiff. To no avail, Plaintiff had been submitting evidence, including police reports, to defendant Shilson, defendant Penater, defendant Khabir, and the BRC Defendants.

217.     They all ignored Plaintiff's complaints and the supporting evidence. They refused to take any meaningful action[3] and signified to him that they

---

[2] 24 C.F.R. § 982.553(a)(2)(ii)(A)(3) prohibits "criminal activity which may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents or persons residing in the immediate vicinity."

[3] 24 C.F.R. § 982.553(c) provides:

would not because, ironically, Mr. Reed was disabled and Los Vecinos was a "harm reduction" facility.

218.   On June 6, 2014, at or about 11:00 AM, a few minutes following his complaint to defendant Shilson regarding Mr. Reed's incessant acts of harassment, intimidation, and coercion, Plaintiff was surprised by the visit of two NYPD Officers investigating his alleged acts of assault and battery against defendant Shilson and defendant Penater.

219.   These Officers stated to Plaintiff that defendant Shilson and defendant Penater were accusing him of being emotionally disturbed, of threatening Los Vecinos residents with acts of violence, of "threatening them with his religion", and of trying to cut himself with a razor.

220.   These Officers asked Plaintiff whether he was suffering from a mental illness.

221.   When Plaintiff protested the intrusive and offensive nature of their question, the two Officers stated to him that defendant Shilson and

---

The PHA may terminate assistance for criminal activity by a household member as authorized in this section if the PHA determines, based on a preponderance of the evidence, that the household member has engaged in the activity, *regardless of whether the household member has been arrested or convicted for such activity* (emphasis added).

defendant Penater requested that they transport him to the Bellevue Psychiatric Hospital for involuntary hospitalization.

222.    The two NYPD Officers stated to Plaintiff that defendant Shilson and defendant Penater reported to them that he had been allegedly suffering from chronic paranoid schizophrenia.

223.    These Officers also stated to Plaintiff that defendant Penater, who was then pregnant, complained to them of having been restrained by Plaintiff from moving freely out of her office.

224.    Moreover, these Officers stated to Plaintiff that defendant Penater reported to them that he had been shouting at her in Arabic and, as a result of his threatening behavior, she was scared, fainted, and lost consciousness.

225.    Prior to the NYPD Officers' response, Plaintiff did not pose any risk of harm to himself or to others.

226.    Plaintiff did not assault or batter defendant Shilson or defendant Penater.

227.    Plaintiff did not threaten with violence defendant Shilson or defendant Penater.

228.    Plaintiff did not restrain defendant Penater's free movement.

229.    Plaintiff did not shout at defendant Penater, whether in Arabic or in English.

230.    Plaintiff has direct knowledge that defendant Penater did not faint and did not lose consciousness.

231.    Plaintiff did not threaten any individual with acts of violence.

232.    While complaining to defendant Shilson, Plaintiff did not show any sign of emotional disturbance.

233.    After a lengthy conversation with Plaintiff, with defendant Shilson, and with defendant Penater, the two NYPD Officers requested from defendant Shilson to allow them access to and review of the video footage of Los Vecinos' security cameras.

234.    They requested review so that they may verify the truthfulness of their allegations before removing Plaintiff to the Bellevue Psychiatric Hospital.

235.    Defendant Shilson refused then to allow them free access, let alone review of the footage.

236.    Both Officers, based on their observations and judgment, concluded that the allegations proffered by defendant Shilson and defendant Penater were not substantiated and, therefore, there was not probable cause to remove Plaintiff pursuant to NYMHY § 9.41.

237.    At all times relevant, both defendant Shilson and defendant Penater were aware that the present action was pending against their employer defendant BRC and, in particular, defendant Kedzior.

238.    On June 6, 2014, the Law Firm Defendants were representing defendant Kedzior in the instant matter before this Court.

239.    At or about 6:30 PM, while walking down Pitt Street, Plaintiff was surprised by the presence of defendant Kedzior.

240.    Defendant Kedzior followed Plaintiff and, rudely, requested that he speak to her about what had happened in the morning.

241.    More stunning, defendant Kedzior asked Plaintiff why he had filed suit against her.

242.    Plaintiff refused to speak to defendant Kedzior, who then started yanking him by the arm towards her.

243.    Plaintiff started running along Pitt Street. He then called 911 to report defendant Kedzior act of harassment.

244.    Plaintiff waited but no NYPD Officer showed up.

245.    A few minutes later, Plaintiff headed to the 7th Precinct. Inside the precinct, while waiting to file a complaint against defendant Kedzior for harassment and stalking, he was again surprised by her presence.

246.    A few minutes later, two NYPD Officers walked towards Plaintiff and, while pointing at defendant Kedzior, informed him that they would transport him to the Bellevue Psychiatric Hospital upon certification by his treating physician.

247.    When he requested to be provided with a valid reason for his hospitalization, they informed him that he assaulted a pregnant woman in the morning and assaulted defendant Kedzior a few minutes ago at Los Vecinos.

248.    Plaintiff informed the Officers that their colleagues responded to a call by defendant Shilson at or about 11:00 AM and determined that he did not assault anybody.

249.    Plaintiff also denied that had met defendant Kedzior at Los Vecinos or assaulted her. Plaintiff stated to the Officers that she had been following him and demanding to speak to him about a pending lawsuit.

250.    Plaintiff informed the Officers that defendant Kedzior was not his treating physician, that he was feeling well, and that he did not have any treating physician at all.

251.    Plaintiff informed the two Officers that he had named Angela Kedzior as a defendant in the pending action before this Court. Plaintiff also informed the Officers that defendant Kedzior is represented by the Law Firm Defendants and that she should refrain from stalking and harassing him.

252.    When the Officers asked defendant Kedzior regarding the pending suit, she condescendingly, yet evasively, answered that Plaintiff was a litigious individual and that he had dozens of suits in the New York courts.

253.    Defendant Kedzior stated to the Officers that her lawyers – the Law Firm Defendants – were aware of her action, of her presence, and of the incident that had occurred in the morning.

254.    Defendant Kedzior stated to the Officers that she was acting upon the legal advice of the Law Firm Defendants.

255.    To further disparage and humiliate Plaintiff, defendant Kedzior stated to the Officers that Plaintiff felt "persecuted by the world." Without restraint, she also maliciously added that Plaintiff had been suffering from chronic paranoid schizophrenia, that he was a violent individual, that he was threatening Los Vecinos residents "with his religion", that he was praying in the hallways, and that he was shouting "Allah-u-Akbar" in the middle of the night.

256.    The Officers laughed in a strange and disrespectful way, leading Plaintiff to believe that they were misperceiving him as some mentally disturbed individual.

257.    In his defense, Plaintiff asserted to the NYPD Officers that all defendant Kedzior's allegations were false, that she was retaliating against him because of the pending suit, and that he, in fact, came to the precinct to press charges against her.

258.    At this moment, one Officer asked Plaintiff to follow him to the ambulance, which had been already waiting before the precinct's entrance, or he would handcuff him and transport him to the Bellevue Psychiatric Hospital in his patrol car.

259.    Plaintiff calmly followed the Officer's instructions and was peacefully transported by the ambulance to the Bellevue Psychiatric Hospital where he stayed for less than 72 hours and was observed by many psychiatrists.

260.    On June 8, 2014, Plaintiff was discharged by those psychiatrists and allowed to return to Los Vecinos.

261.    Plaintiff was allowed to return to Los Vecinos because, according to those psychiatrists' evaluations, he was not mentally ill, he did not pose any risk of harm to himself or to others, he was not addicted to any chemical substance, and he was not emotionally disturbed upon his reception by the Bellevue Psychiatric Hospital.

262.    Upon his return to Los Vecinos on June 8, 2014, defendant Shilson and defendant Penater were dismayed and asked to see Plaintiff's discharge.

263.    Plaintiff showed them his certified discharge.

264.    A resident stated to Plaintiff that defendant Shilson and defendant Penater had told him that Plaintiff would not be allowed back to the facility and that he would be placed in the Bellevue men's shelter.

265.    Such statement proves to Plaintiff that his hospitalization was malicious and was orchestrated by them to remove him from Los Vecinos.

266.    A couple of days after his return, Mr. Reed resumed his sport of harassment and intimidation

267.    This time, he was overtly incited and encouraged by both defendant Shilson and defendant Penater.

268.    Defendant Shilson and defendant Penater used to disparagingly refer to Plaintiff's immigration status in front of Mr. Reed – a sign to have the latter stage more attacks against Plaintiff without fear of retribution.

269.    With time, Mr. Reed's acts became more hostile, offensive, and violent.

270.    Mr. Reed placed male pornography material in front of Plaintiff's door.

271.    On the wall facing Plaintiff's door, Mr. Reed posted pictures showing handguns, bullets, and blood.

272.    When Plaintiff complained to defendant Shilson and defendant Penater about the threatening and offensive signs, they did not bother taking the elevator to the third floor and confirm what Plaintiff had seen.

273.    Rather, they stated to Plaintiff that residents have the right to exercise their First Amendment rights inside the building.

274.    A month following Plaintiff's hospitalization and the BRC Defendants' failure to remove him, Plaintiff suddenly learned that defendant Shilson's employment  was terminated.

275.    Defendant Penater replaced defendant Shilson as the Director of Los Vecinos.

276.    Defendant Nicholson was hired as the Clinical Supervisor.

277.    Each time Plaintiff was assaulted, or battered, he would call 911.

278.    However, the NYPD Officers would not investigate.

279.    And even when they investigated Plaintiff's allegations of assault and battery and there was ample evidence to substantiate them, they never charged Mr. Reed with anything more than simple acts of harassment.

280.    On the night of January 5 to January 6, 2015, Plaintiff called 911 to report that Mr. Reed threw rocks at him and harmed him.

281.    Mr. Reed, who was intoxicated, had already assaulted Plaintiff, hit him with rocks, and broke one of his ribs.

282.    When the respondent Officers, who were African-Americans, showed up, they accused Plaintiff of making a false report, of being racist, and of causing problems to drive Mr. Reed out of his dwelling.

283.    At the time they were uttering those false accusations, the smell of synthetic marijuana was coming out of Mr. Reed's room and the music was excessively loud.

284.    Instead of being alarmed by the smell and noise, thus prompting their investigation, they engaged in intimidating Plaintiff and threatening to arrest him if he ever called 911 again.

285.    The next morning, Plaintiff complained to defendant Penater and defendant Nicholson that Mr. Reed had assaulted him and broken his rib with a rock.

286.    They pretended to review the video footage and stated to Plaintiff that they were not able to conclude whether there had been assault or not.

287.    Plaintiff confronted defendant Penater and defendant Nicholson with video footage captured with his phone's camera, showing Mr. Reed threatening Plaintiff with a rock.

288.    This incident occurred just a few minutes before Plaintiff had been assaulted and hit with the rock.

289.    Defendant Penater's state of denial only strengthened Plaintiff's conviction that the BRC Defendants had been instigating Mr. Reed's violent attacks against him.

290.    The BRC Defendants were ignoring and condoning – if not encouraging and planning – such violent attacks with the purpose to cause the removal of Plaintiff from Los Vecinos.

291.    In view of this reality, Plaintiff reminded defendant Penater and defendant Nicholson that he would take the necessary legal action to assert his rights and remedy violations of the Fair Housing Act.

292.    Finding another pretext to violate Plaintiff's housing rights, defendant Penater stated to Plaintiff that he was threatening her. This was another naked act of intimidation.

293.    To warn their retaliatory conduct off, Plaintiff informed defendant Penater and defendant Nicholson that he had already filed a complaint with HUD and that any act of retaliation would not be condoned.

294.    Indeed, on August 8, 2014, Plaintiff filed a complaint with HUD's Office for Civil Rights alleging violations of the Fair Housing Act, including interference, intimidation, and coercion.

295.    The New York agency to which HUD referred Plaintiff's complaint declined to reach a determination and resolve the complaint because of the pending present action.

296.     On January 6, 2015, defendant Kedzior showed up again at Los
         Vecinos, started interrogating and filming Plaintiff with her cell phone's
         camera.

297.     Defendant Kedzior's act is demeaning, despicable, unethical, and is
         clearly a departure from the sound medical practice.

298.     While engaging in such misconduct, Plaintiff captured this moment
         with his camera in the presence of defendant Penater and defendant Khabir[4].

299.     At no time did Plaintiff attacke either defendant Kedzior, defendant
         Penater, or defendant Khabir.

300.     At no time did Plaintiff show any signs of mental disturbance.

301.     Plaintiff refused to speak with defendant Kedzior, stood up, and left
         the dining room.

302.     At the time of the above-mentioned encounter, defendant Penater and
         defendant Khabir had not yet been named defendants in the present action.

303.     A few hours later, defendant Gaglione, with other Officers, knocked
         on Plaintiffs' door and informed him that he had to transport him to the
         psychiatric hospital.

304.     Both defendant Penater and defendant Nicholson were present during
         Plaintiff's conversation with defendant Gaglione.

---

[4] *See* **https://vimeo.com/132290823/8e64a549cb**

305.    While speaking to defendant Gaglione, Plaintiff was calm and serene.

306.    Plaintiff was not emotionally disturbed.

307.    Plaintiff did not show signs of emotional disturbance.

308.    Plaintiff was not a risk of harm to himself or to others.

309.    Plaintiff did not have any weapon.

310.    At all times relevant, while calmly requesting explanations as to his removal by defendant Gaglione, Plaintiff did not threaten any individual with an act of violence.

311.    At all times relevant, Plaintiff reiterated his complaints to defendant Gaglione regarding the smell of synthetic marijuana and the acts of violence to which he had been subjected by Mr. Reed.

312.    Defendant Gaglione did not investigate Plaintiff's claims.

313.    Considering defendant Gaglione's condescending tone, as demonstrated by the video[5], he was misperceiving Plaintiff as a mentally disabled individual.

314.    Notwithstanding the fact that defendant Gaglione did not witness any act which generally, as a matter of standard procedure, requires him to remove a disturbed subject as per NYMHY § 9.41, he nonetheless made the decision to remove Plaintiff in particular.

---

[5] *See* **https://vimeo.com/132287050/7ed5a43cc4**

49

315.     Defendant Gaglione discriminated against Plaintiff.

316.     Defendant Gaglione also retaliated against Plaintiff because he was filming him and his colleagues.

317.     As reflected by the video, defendant Gaglione did not appear to be surprised as he was being filmed by Plaintiff.

318.      Prior to the videotaped encounter, defendant Penater and defendant Nicholson had already informed defendant Gaglione about Plaintiff's practice of filming his interactions within the building.

319.     She falsely accused Plaintiff of harassing the residents with his filming activities.

320.     Plaintiff's filming activities were performed for his protection. They were performed to record and contradict the BRC Defendants' malicious.

321.     Filming was carried out in all legality to substantiate the BRC Defendants' unlawful acts of abuse, discrimination, and retaliation.

322.     Plaintiff's filming activity was annoying to the BRC Defendants because it frustrated and defeated their false allegations, malicious representations, and blatant violations of the residents' rights.

323.     The letter handed to defendant Gaglione, as shown by the video, is not a certification as per NYMHY § 9.27.

324.     Prior to his removal, Plaintiff was not examined by two physicians pursuant to NYMHY § 9.27(a).

325.     To this day, defendant Kedzior has refused to release copies of her alleged certifications.

326.     Defendant Kedzior did not witness the above-described events warranting certification and did not examine Plaintiff for the alleged ailments leading to his involuntary hospitalization.

327.     Defendant Kedzior's alleged certification is fraudulent because it was not based on direct observation and knowledge.

328.     It is based on defendant Penater's observations and misdiagnosis.

329.     Defendant Penater is not a physician and cannot issue a certification within the meaning of NYMHY § 9.27(a).

330.     However, she falsely represented to Plaintiff and other residents that she was a New York licensed psychotherapist and psychologist.

331.     When confronted by Plaintiff after Plaintiff's hospitalization, she denied she was a licensed practitioner[6].

332.     Anyway, Plaintiff was transported to the Mount Sinai Psychiatric Hospital and placed under observation for 72 hours. Coincidentally, he was

---

[6] *See* **https://soundcloud.com/user118813203/brc-fraudulent-reports/s-BKm9a**

placed with the most severely mentally ill and most violent patients of the ward.

333.    Plaintiff kept calm, collaborative, and responsive.

334.    The treating physicians informed Plaintiff that, based on defendant Kedzior's report, he was hospitalized for chronic paranoid schizophrenia because he had been allegedly stalking residents, following them to their rooms, and filming them in their privacy.

335.    The treating physicians informed Plaintiff that, based on defendant Kedzior's report, he was hospitalized because he was allegedly suffering from alcohol use disorder.

336.    The treating physicians informed Plaintiff that, based on defendant Kedzior's report, he was hospitalized because he was an extremely violent individual, who threatened both BRC staff and Los Vecinos residents with acts of violence.

337.    All those misdiagnoses and misrepresentations proved to be unsubstantiated, fraudulent, and malicious.

338.    Plaintiff was again discharged to Los Vecinos.

339.    This time, considering the videos proving assault, the BRC Defendants had no other choice but to remove Mr. Reed.

340.    Yet, even though he may still cause harm to people around him, he lives, upon information and belief, in one of defendant BRC's facilities.

341.    In spite of all these acts of intimidation, coercion, and interference with Plaintiff's rights, the BRC Defendant and the Law Firm Defendants kept on trying their luck again so that Plaintiff could be removed.

342.    On December 15, 2015, defendant Nicholson let two armed individuals, without a search or arrest warrant, take the elevator and break their way into Plaintiff's room without his consent or invitation.

343.    To have Plaintiff open the door, they deceived him and announced themselves as the maintenance staff.

344.    When Plaintiff opened the door, they both rushed in.

345.     One of them stood in front the door and blocked the sole exit to the hallway.

346.    Plaintiff's free movement was then restrained.

347.    Initially, these individuals claimed to be NYPD detectives.

348.    However, they refused to identify themselves by providing their full names and their shields' numbers.

349.    They refused to leave Plaintiff's room when directed to do so.

350.    They insisted that they were investigating Plaintiff's complaints against his neighbors.

351.     They accused Plaintiff of threatening the residents "with his religion."

352.     At first, such an accusation did not make any sense to Plaintiff.

353.     Plaintiff suspected that their statements and accusations were irrational.

354.     After more minutes of their irrational conduct, Plaintiff gathered that these two individuals were seeking information that has nothing to do with a tenant issue.

355.     Indeed, they already began asking Plaintiff about Islam, his religious practices, his beliefs, his family, his friends, his travels, his immigration status, his former spouse, and so forth.

356.     Their questions were so intrusive and personal that they had nothing to contribute to a tenant issue resolution.

357.     Plaintiff understood that these individuals were rather after information pertinent to terrorist activities.

358.     Plaintiff also understood that they were after entrapment and that such practices were condemned by civil liberties advocates[7].

359.     They seemed to know two many minute details about Plaintiff, the building, and the residents that nobody would ever know, except the BRC defendants.

---

[7] *See* the Human Rights Watch report attached hereto and titled "Illusion of Justice: Human Rights Abuses in US Terrorism Prosecutions."

360.    Upon information and belief, these individuals invaded Plaintiff's room because they had been falsely alerted of a suspicious Muslim individual by the BRC Defendants and the Law Firm Defendants.

361.    These armed individuals, without Plaintiff's consent, inspected Plaintiff's belongings and papers.

362.    They took pictures of Plaintiff's papers and belongings with their phones' cameras.

363.    Plaintiff refused to answer their growingly intrusive questions and, again, asked them to leave.

364.    They refused to leave.

365.    Plaintiff informed them that they were violating his Federal constitutional rights.

366.    Upon hearing "Federal constitutional rights", they stated to Plaintiff that they were FBI agents.

367.    When Plaintiff asked them to produce their FBI credentials, they refused to do so.

368.    However, one of them, who had an East European accent, showed his handgun as if it were a credential.

369.    Frightened, Plaintiff headed towards the door and tried to leave the room.

370.    However, they restrained Plaintiff's movement and ordered him to sit down.

371.    Suddenly, to their surprise, Plaintiff dialed 911 and put the loud speakers on.

372.    Plaintiff informed the dispatcher that two strange, uninvited, armed individuals broke into his room and refused to leave.

373.    Plaintiff also informed the dispatcher that these individuals were representing to him they were FBI individuals.

374.    At this instant, the two individuals decided to leave and started moving out.

375.    Mysteriously, one of them suddenly claimed to be a Russian Muslim.

376.    This did not change the fact that Plaintiff was still insisting that they leave.

377.    As they were leaving, one of them, who appeared to be a Hispanic, stated to Plaintiff that they would have killed him if they had a chance to do so without being identified by the BRC staff.

378.    Plaintiff felt that such statement was a chilling, direct threat.

379.    Following their departure, no NYPD Officer showed up.

380.    Plaintiff walked to the 7th Precinct and complained to a 7th Precinct sergeant.

381.    Upon Plaintiff's request, the sergeant dispatched Officers to Los Vecinos where they feigned, in Plaintiff's presence, investigating by questioning a startled and haggard receptionist who, at the time of the above-described events, had not yet started her shift and, therefore, had no knowledge of the events being investigated.

382.    Such receptionist stated to the investigating Officers that she had no knowledge of the presence of any armed individuals in the building.

383.    They ignored her answers and, nonetheless, continued to question her.

384.    Plaintiff was then convinced that the 7th Precinct and its investigating Officers had been aware of the presence of the armed individuals.

385.    To this day, the 7th Precinct Officers have refused to thoroughly investigate the unlawful acts of said armed individuals or issue a report regarding the incident.

386.    Plaintiff then complained to the Internal Affairs Bureau.

387.    Defendant Sansone contacted Plaintiff by telephone and email and represented to him that he was assigned to conduct an investigation regarding the unlawful acts committed by the armed individuals.

388.    Although defendant Sansone stated to Plaintiff, in a telephone conversation, that the BRC Defendants made the "poisonous call" and

falsely reported suspicious terrorist activities at Los Vecinos, he has nevertheless declined to issue any determination or report.

389.    His investigation is still pending.

390.    Plaintiff also complained to defendant CCRB.

391.    Their investigation does not appear to be independent. Indeed, while characterizing in a July 13, 2016 letter that Plaintiff's accusations were unsubstantiated, they nevertheless identified the detectives as defendant Posternak and defendant Torres.

392.    Plaintiff also complained to the Office of the Inspector General for NYPD, NYC Department of Investigations.

393.    Plaintiff complained to the Office of the Inspector General about defendant NYPD's unlawful practice of selective law enforcement and their illegal program of spying on Muslims.

394.    Despite the evidence proffered by Plaintiff, defendant Cahill of the Office of the Inspector General refused to investigate Plaintiff's allegations of unlawful selective law enforcement, impersonation of Federal agents, and the NYPD's illegal program of spying on members of the Muslim community.

395.    To add insult to injury, the BRC Defendants, to this day, continue to harass Plaintiff and discriminate against him.

396.    On June 3, 2016, as he was peacefully requesting that his room be provided with air conditioning, in accordance with the terms of the rental agreement, a BRC staff member threatened to call NYPD and falsely reported to them that Plaintiff had been committing the criminal act of harassing the BRC staff[8].

397.    Before placing the 911 call, the BRC staff member conferred with defendant Penater by telephone.

398.    Defendant Penater gave her permission to call 911.

399.    When defendant Hughes and her partner arrived and began investigating defendant BRC's allegations, they determined that no crime had ever occurred and that the dispute was strictly a tenant-landlord civil matter.

400.    While investigating the allegations, the BRC staff member took defendant Hughes aside and maliciously, falsely stated to her that Plaintiff had a "medical history."

401.    At the end of the investigation[9], Defendant Hughes is heard threatening Plaintiff of arrest based on an alleged "medical history" – meaning mental illness – of which she had no direct evidence.

---

[8] *See* **https://vimeo.com/169318699/e918d759de**

[9] *See* **https://vimeo.com/169322125/691ef6409c**

402.     The act of calling 911 was another proof of intimidation and coercion by Defendant BRC with the intent to retaliate against Plaintiff and deter him from asserting his housing rights.

## G. CAUSES OF ACTION

### I.     Violations Of Plaintiff's Rights Under Color Of Law As To The City Defendants

403.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

404.     The City Defendants acted under the color of law and deprived Plaintiff of rights protected by the First, Fourth, and Fourteenth Amendments to the United States Constitution.

405.     Defendant Gaglione, without cause, involuntary hospitalized Plaintiff because he was exercising his rights under the First Amendment.

406.     Defendant Hughes, based on Plaintiff's alleged "medical history" intimidated Plaintiff by threatening to arrest him. There was not probable cause for the threatened arrest.

407.     Twice, on June 2014 and on January 6, 2015, Plaintiff was seized and had his freedom curtailed without probable cause.

408.    At all times herein relevant, the City Defendants have had knowledge

of Plaintiff's race (Arab) and religion (Muslim).

409.    The City Defendants intentionally discriminated against Plaintiff

based on his race (Arab) because they denied him the full and equal benefit

of all laws and proceedings for the security of his person and property as is

enjoyed by white citizens.

410.    At all times herein relevant, the City Defendants have regarded

Plaintiff as a disabled individual.

411.    The City Defendants intentionally discriminated against Plaintiff, by

denying him the full and equal benefit of all laws and proceedings for the

security of his person and property, because they regarded him as a disabled

individual living in a Section 811 program facility.

412.    Defendant Posternak and defendant Torres walked into Plaintiff's

room without his consent or permission.

413.    Plaintiff did not invite Defendant Posternak and defendant Torres to

walk into his room.

414.    Plaintiff opened his door when he heard defendant Posternak and

defendant Torres knocking and announcing themselves as "maintenance."

415.    Defendant Posternak and defendant Torres committed misconduct by

using deceitful, unprofessional, and unlawful tactics.

416.    Defendant Posternak and defendant Torres used obscenities and abused Plaintiff.

417.    Defendant Posternak and defendant Torres misrepresented to Plaintiff that they were investigating Defendant BRC's complaint to them that Plaintiff had been [sic] "threatening them with his religion."

418.    Defendant Posternak and defendant Torres asked Plaintiff about his religious practice and threatened to arrest him if he did not "give them the right answers."

419.    Defendant Posternak and defendant Torres searched Plaintiff's room without a search warrant.

420.    Defendant Posternak and defendant Torres seized Plaintiff's papers and property without a valid warrant.

421.    Defendant Posternak and defendant Torres took pictures of Plaintiff, his room, his belongings, and his papers.

422.    Plaintiff did not grant defendant Posternak and defendant Torres permission to inspect, search, or seize his papers or property.

423.    Based on the herein articulated and verifiable facts, defendant Posternak's and defendant Torres' search and/or seizure was unreasonable.

424.    To intimidate Plaintiff, Defendant Posternak and defendant Torres flashed their guns at Plaintiff in his home.

425.     Defendant Posternak and defendant Torres restrained Plaintiff from leaving his room.

426.     Defendant Posternak and defendant Torres stated to Plaintiff that they would have killed him if they had a chance to do so without being identified by the BRC staff.

427.     Defendant Posternak and defendant Torres refused to identify themselves to Plaintiff by stating their full names and their shields numbers.

428.     Defendant Posternak and defendant Torres misrepresented to Plaintiff and to defendant Nicholson that they were FBI agents.

429.     Plaintiff was not engaging in any suspicious criminal activity at the time defendant Posternak and defendant Torres unlawful broke into his room.

430.     Defendant Posternak and defendant Torres did not have a probable cause to break into Plaintiff's room.

431.     Defendant Posternak and defendant Torres violated Plaintiff's rights by trying to entrap him and make him make incriminating statements so that they may prosecute him with criminal charges of terrorism.

432.     Defendant Posternak and defendant Torres targeted Plaintiff because they received information from the BRC Defendants and NYPD Officers that an allegedly unstable Muslim individual lived at Los Vecinos.

433.     Defendant Posternak and defendant Torres targeted Plaintiff, tried to entrap him, and thus deprive him of the equal protection of the laws because they misperceived him as a mentally disabled individual.

434.     The City Defendants, defendant Posternak, and defendant Torres denied Plaintiff his rights under the color of law because of his race (Arab) and religion (Muslim).

435.     At all times relevant, Plaintiff did not commit a crime.

436.     Plaintiff did not resist arrest or physically threaten defendant Posternak and defendant Torres

437.     While defendant Posternak and defendant Torres were committing their unlawful acts, Plaintiff called 911 to report their misconduct and seek help.

438.     Defendant NYPD did not respond to Plaintiff's call and did not dispatch its Officers for investigation.

439.     The City Defendants devised an unlawful policy to spy on Muslims and deprive them of constitutional rights.

440.     The City Defendants engaged in unlawful selective law enforcement based on religion (Islam).

441.    Defendant Posternak and defendant Torres were carrying out this conscience-shocking policy when they violated Plaintiff's rights to substantive due process.

442.    The actions of these two rogue detectives are not incorrect or ill advised. They are arbitrary and oppressive.

443.    Defendants NYPD, its Officers, and the City of New York acted under color of state law when they exercised power possessed by virtue of New York State law and made possible only because they are clothed with the authority of state law.

## II.    Unlawful Discrimination In Violation Of 42 U.S.C. § 2000d As To The City Defendants

444.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

445.    The City Defendants discriminated against Plaintiff on the basis of race (Arab) and religion (Muslim).

446.    The City Defendants, as articulated above, have always been aware that Plaintiff is Muslim Arab.

447.    Their intentional discrimination was intentional as it denied and restricted Plaintiff in many ways in the enjoyment of any advantage or privilege enjoyed by others receiving any service from defendant NYPD.

448.    The City Defendants discriminated against Plaintiff by denying him the equal protection of the laws.

449.    The City Defendants discriminated against Plaintiff by denying him the right to due process.

450.    The City Defendants denied Plaintiff an impartial and independent investigation of his claims of Fourth Amendment violations by defendant Posternak and defendant Torres.

451.    To this day, defendant Philip Sansone refuses to provide Plaintiff with a definitive determination of his investigation of the unlawful acts of defendant Posternak and defendant Torres.

452.    Despite civil actions and injunctions brought by other Muslim and Arab complainants, whether in this District, the Eastern District of New York, or the District of New Jersey, about the City Defendants' unlawful and discriminatory practices of spying on the Muslim community, Defendant Patrick Cahill has refused to investigate whether the unlawful acts of defendant Posternak and defendant Torres constitute another departure from the non-discriminatory and neutral policies of law enforcement.

453.     The violations committed by defendant Sansone, defendant Cahill, defendant Posternak, and defendant Torres constitute selective law enforcement based on religious profiling.

454.     These violations are unconstitutional and violate Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

455.     The involuntary hospitalizations of June 6, 2014 and January 6, 2015 by the City Defendants are also violations of the Fourteenth Amendment.

456.     They constitute an unwarranted curtailment of Plaintiff's freedom and are also blatant violations of Plaintiff's rights under the Fourth Amendment to be free from unreasonable search and seizure.

457.     They are not privileged actions as prescribed by NYMHY § 9.41.

458.     They are not privileged actions as prescribed by NYMHY § 9.27 because the City Defendants were not provided by any certification.

459.     As the City Defendants did not justify their actions by provisions of the New York Mental Hygiene Law, by any criminal suspicion, or by any probable cause defense, their violation of Plaintiff's right to substantive due process is now established and discrimination was the substantial or motivating factor for the City Defendants actions.

460.     The City Defendants receive Federal financial aid to combat terrorism within the absolute respect the citizens' constitutional rights.

461.     A defense of combating terrorism should not be a pretext to trample upon and violate Plaintiff's constitutional rights.

462.     Plaintiff was denied from the right of participating in a Federal program, which is a homeland security effort, and, instead, had his rights violated, on account of his race and religion, to satisfy the performance of said Federal program.

### III.   Defendant City Is Liable Under 42 U.S.C. § 1983

463.     Under the standards of *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), Defendant City is liable under 42 U.S.C. § 1983 because the deprivation of Plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality.

464.     Defendant City is liable for the above-described practices because they are so persistent and widespread as to practically have the force of law.

465.     Defendant City is liable on a *respondeat superior* basis for the tort of its employees.

466.     Defendant City's practices amount to *deliberate* conduct, and are thus the 'moving force' behind Plaintiff's injury.

467.     The unlawful actions of both defendant Posternak and defendant Torres are part of a widespread practice, which is ratified by policymakers,

and which allows Defendant City and Defendant NYPD to selectively enforce the law based on religious profiling.

468.    Federal courts have ruled that this widespread and recurrent practice is unconstitutional.

469.    In light of said rulings, the Defendant City's policymaking officials were aware of constitutional injury, or the risk of constitutional injury, caused by the selective law enforcement but failed to take appropriate action to prevent or sanction violations of constitutional rights.

470.    The municipal actors herein named or unnamed disregarded known or obvious consequences of their rogue, egregious, or unlawful actions.

471.    Plaintiff was hospitalized twice and had his rights violated by Defendant City because the practice of automatic and unwarranted hospitalizations is also a common practice arbitrarily used by Defendant NYPD.

472.    Automatic involuntary hospitalizations based on hearsay, without thorough investigation of the facts, without strict implementation of the Mental Hygiene Law provisions, such as NYMHY § 9.41, and without proper documentation, or authentication of the medical certifications, is a widespread practice by NYPD.

473.     This practice violates the rights of citizens, such as Plaintiff, who are regarded as mentally disabled because they have a record of mental impairment, albeit inaccurate or fraudulent, or because they happen to reside in a mental health facility for no fault of their own.

474.     Practices such as these ones need not be memorialized in a specific rule or regulation in order for the City Defendant to be liable.

475.     Plaintiff's involuntary hospitalizations by low-level employees, such as defendant Gaglione, have caused him serious injury.

476.     Defendant City is liable because a policymaking NYPD official ordered or ratified the employee's actions — either expressly or tacitly.

477.     At all times herein relevant, the Captain of the 7th Precinct was aware and approved his Officers decisions to hospitalize Plaintiff.

478.     At all times herein relevant, officials from the NYPD Intelligence Division & Counter-Terrorism Bureau ordered and ratified the rogue and unlawful actions of defendant Posternak and defendant Torres.

479.     Upon information and belief, no Officer from the 7th Precinct was disciplined for involuntarily hospitalizing Plaintiff without substantive due process.

480.     Upon information and belief, defendant Posternak and defendant Torres were not disciplined by their superiors.

481.    The above-described policies, customs, or practices are prevalent because Defendant City and Defendant NYPD failed to train its employees, who, by their unlawful actions, display a deliberate indifference to the constitutional rights of Plaintiff and those within their jurisdiction.

482.    Said policies, customs, and practices subjected and caused Plaintiff to be subjected a deprivation of his constitutional rights.

## IV.   Unlawful Discrimination In Violation Of 42 U.S.C. § 1981 As To The BRC Defendants And The City Defendants

483.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

484.    Plaintiff is an Arab.

485.    Both the BRC Defendants and the City Defendants, at all times relevant herein, have had knowledge that Plaintiff is an Arab.

486.    The BRC Defendants, for the purpose of 42 U.S.C. § 1981, are persons and private contractors.

487.    The City Defendants are covered by rights afforded to Plaintiff under 42 U.S.C. § 1981.

488.    42 U.S.C. § 1981(c) protects Plaintiff against impairment under color of New York law.

489.     As alleged above, the City Defendants intentionally discriminated against Plaintiff, on account of his being an Arab, by depriving him of the full and equal benefit of all laws and proceedings for the security of his person and property, as enjoyed by white citizens.

490.     The City Defendants discriminated against him, on account of his being an Arab, by denying Plaintiff his rights under the First Amendment, the Fourth Amendment, and the Fourteenth Amendment to the United States Constitution.

491.     The City Defendants discriminated against Plaintiff, on account of his being an Arab, and denied him the right to be free from unreasonable search and seizure by unlawfully occupying his room, restraining his movement against his will, and searching his room, his property, and his papers without search warrant.

492.     The City Defendants discriminated against Plaintiff, on account of his being an Arab, and denied him due process and the equal protection of the laws by selectively enforcing the law based on racial profiling.

493.     The City Defendants discriminated against Plaintiff, on account of his being an Arab, and denied him the right to be free from unreasonable search and seizure by curtailing his freedom and arbitrarily committing him to a psychiatric hospital without probable cause.

494.     As related above, the BRC Defendants intentionally, on account of his being an Arab, denied Plaintiff the right to make and enforce a contract with defendant BRC, to give evidence to NYPD Officers, and to the full and equal benefit of all laws and proceedings for the security of his person and property.

495.     The BRC Defendants, on account of his race as an Arab, discriminated against Plaintiff by excluding him from enjoying all benefits, privileges, terms, and conditions of a contractual relationship, including the benefit of referring him to suitable, permanent, and subsidized housing.

496.     The BRC Defendants, on account of his race as an Arab, discriminated against Plaintiff by excluding him from enjoying all benefits, privileges, terms, and conditions of a tenant-landlord contractual relationship, including the benefit of living in a housing environment without nuisances, harassment, violence, drugs, and smoke.

497.     The BRC Defendants, on account of his race as an Arab, discriminated against Plaintiff by refusing to enforce the terms and conditions of a tenant-landlord contractual relationship.

498.     The BRC Defendants, on account of his race as an Arab, discriminated against Plaintiff and denied him protections of his rights under HIPAA, Title V of the Mental Health Systems Act, 42 U.S.C. § 9501 *et seq.*,

the Restatement of Bill of Rights for Mental Health Patients, 42 U.S.C. § 10841, Sections 1 and 4 of Article XVII of the New York State Constitution, and NYMHL §§ 33.16 and 33.25.

499.    The BRC Defendants, based upon his race, discriminated against Plaintiff by denying him timely and full access to his medical and other records.

500.    On December 16, 2014, HHS determined that the BRC Defendants discriminated against and denied Plaintiff timely and full access to his medical records, in violation of the HIPAA Privacy Rule, as regulated by 45 C.F.R. Part 160 and Subparts A and E of Part 164.

501.    On account of his race, the BRC Defendants denied Plaintiff the right to access video footage in order for him to present evidence and substantiate his claims of abuse, including theft, battery, and assault.

502.    The BRC Defendants, based upon his race, discriminated against Plaintiff and interfered with his right to complain to the competent agencies in order for him to report violations and criminal activities affecting his well being both as a homeless shelter resident and a tenant.

503.    Defendants, based upon his race, discriminated against Plaintiff and denied Plaintiff the right to engage in protected housing activity.

504.     Defendants, based upon his race, discriminated against Plaintiff and denied him the right to be secure in his person and his belongings.

505.     The BRC Defendants, based upon his race, discriminated against Plaintiff and denied him referral services to the type of permanent housing suiting his needs as a mentally stable individual, who is not suffering from any mental disability.

506.     The BRC Defendants referred other residents, who are not Arabs, to suitable and permanent housing reserved for functional individuals. Yet, in an act of intentional discrimination, they referred Plaintiff to a Section 811 program strictly designed for individuals with mental disabilities.

507.     The BRC Defendants, based upon his race, discriminated against Plaintiff by creating fraudulent medical evaluations and reports for the purpose of meeting the disability requirements set by 42 U.S.C. § 8013 and securing financial gain by receiving Section 8 rent payments.

508.     As stated above, all these rights denied to Plaintiff, as enumerated above, were not denied to non-Arab residents or tenants.

## V.   Unlawful Retaliation In Violation Of 42 U.S.C. § 1981 As To The BRC Defendants

509.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

510.     Plaintiff participated in a protected activity by complaining of racial discrimination to the BRC Defendants at the Jack Ryan Residence and Los Vecinos.

511.     Plaintiff participated in a protected activity by complaining to the BRC Defendants of their failure to enforce their contractual relationship both at the Jack Ryan Residence and Los Vecinos.

512.     Plaintiff participated in a protected activity by complaining to the BRC Defendants of criminal activity affecting his personal safety and the security of his property.

513.     Plaintiff participated in a protected activity by complaining to OASAS of narcotics sales and use within the premises of the Jack Ryan Residence.

514.     The BRC Defendants took an adverse action against Plaintiff by denying him the most basic rights under HIPAA, Title V of the Mental Health Systems Act, 42 U.S.C. § 9501 *et seq.*, the Restatement of Bill of Rights for Mental Health Patients, 42 U.S.C. § 10841, Sections 1 and 4 of Article XVII of the New York State Constitution, and NYMHL §§ 33.61 and 33.25.

515.     The BRC Defendants retaliated against Plaintiff by causing residents and BRC staff to unlawfully access Plaintiff's locker and steal his property at the Jack Ryan Residence.

516.   In retaliation to his engagement in protected activity at the Jack Ryan Residence, the BRC Defendants maliciously referred and placed Plaintiff in a Section 811 program designed for mentally disabled individuals.

517.   The BRC Defendants retaliated against Plaintiff because, on July 31, 2013, he filed a discrimination complaint with the HHS's Office for Civil Rights.

518.   The BRC Defendants retaliated against Plaintiff because, in September 2013, he filed the present action alleging unlawful discrimination in violation of 42 U.S.C. § 1981.

519.   The BRC Defendants retaliated against Plaintiff by creating fraudulent records characterizing him as a mentally disabled individual.

520.   The BRC Defendants retaliated against Plaintiff on June 6, 2014 by generating false reports and misdiagnoses with the intent to commit Plaintiff to a psychiatric hospital.

521.   The BRC Defendants retaliated against Plaintiff on January 6, 2015 by generating false reports and misdiagnoses with the intent to commit Plaintiff, for the second time, to a psychiatric hospital.

522.   The BRC Defendants retaliated against Plaintiff by false accusing him of threats of violence and acts of violence against the BRC staff and the Los Vecinos residents.

523.    The BRC Defendants retaliated against Plaintiff by falsely alerting, on December 15, 2015, NYPD to suspicious terrorist activities alleged undertaken by Plaintiff.

### VI.   Unlawful Discrimination In Violation Of 42 U.S.C. § 3604 As To BRC Defendants

524.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

525.    The BRC Defendant are covered by the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

526.    In violation of 42 U.S.C. § 3604(b), the BRC Defendants unlawfully discriminated against Plaintiff in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of his race (Arab), religion (Muslim), and national origin (Moroccan).

527.    At all times relevant herein, the BRC Defendants have control and authority over the terms, conditions, or privileges of rental of Plaintiff's dwelling at Los Vecinos.

528.    42 U.S.C. § 3604(b) prohibits the creation of a "hostile environment" by individuals who have control or authority over the "terms, conditions, or privileges of sale or rental of a dwelling."

529.     As articulated above, Plaintiff demonstrated the deliberate creation of a hostile housing environment by the BRC Defendants in violation of 42 U.S.C. § 3604(b).

530.     In violation of 42 U.S.C. § 3604(b), the BRC Defendants created the above-described conditions of harassment.

531.     As set forth above, Plaintiff was subjected to harassment that was sufficiently pervasive and severe so as to create a hostile housing environment.

532.     The harassment occurred because Plaintiff was a Muslim Arab Moroccan.

533.     The BRC Defendants falsely accused Plaintiff of acts of violence because of his race and religion.

534.     They falsely accused him of praying in the hallways in reference to his religion.

535.     They falsely accused him of shouting Allah-u-Akbar in the middle of the night, while everybody is resting.

536.     They abusively tried to commit his to a psychiatric hospital based on those false accusations, which were attributed to him based on his race, religion, and national origin.

537.     They call the NYPD and alerted them about a suspicious terrorist activity undertaken by Plaintiff, all in reference to his race, religion, and national origin.

538.     It is clear that there is a nexus between the above-enumerated acts of harassment, amounting to civil rights violations, and Plaintiff substandard housing conditions.

539.     Other non-Arab, non-Muslim, and non-Moroccan residents were not subjected to such a pervasive hostile housing environment.

540.     The also discriminated against Plaintiff in the terms, conditions, or privileges of rental of a dwelling because of a perceived mental disability, in violation of 42 U.S.C. § 3604(f)(2).

541.     At all times relevant herein, Plaintiff has been regarded by the BRC Defendants as a mentally disabled individual.

542.     In violation of 42 U.S.C. § 3604(f)(2), the BRC Defendants discriminated against Plaintiff and refused to enforce the New York City Smoke-Free Air Act of 2002 because they regarded Plaintiff as a mentally disabled individual.

543.     In violation of 42 U.S.C. § 3604 (f)(2), the BRC Defendants discriminated against Plaintiff and refused to enforce the provisions of 42 U.S.C § 13662, relative to the termination of tenancy and assistance for

illegal drug users and alcohol abusers in federally assisted housing, because they regarded Plaintiff as a mentally disabled individual.

544.    In violation of 42 U.S.C. § 3604 (f)(2), the BRC Defendants discriminated against Plaintiff and refused to enforce the provisions of 42 U.S.C § 13662, relative to the termination of tenancy and assistance for illegal drug users and alcohol abusers, such as Mr. Reed, in federally assisted housing, because they regarded Plaintiff as a mentally disabled individual.

545.    In violation of 42 U.S.C. § 3604 (f)(2), the BRC Defendants discriminated against Plaintiff and refused to discharge their duty of guaranteeing, as a responsible landlord, a habitable building free of rodents and health hazards, all because they regarded Plaintiff as a mentally disabled individual.

546.    In violation of 42 U.S.C. § 3604 (f)(2), the BRC Defendants discriminated against Plaintiff and compelled him to receive services he does not request, and which are not part of his rental agreement, such as intrusive monthly inspections and visits to his apartment in his absence, all because they regarded Plaintiff as a mentally disabled individual.

547.    The BRC Defendants discriminated against Plaintiff in violation of 42 U.S.C. § 3604 (f)(2) by exposing him, on account of a perceived disability,

to acts of severe harassment, violence, health hazards, fire hazards, and in violation of 42 U.S.C. § 8013(i)(2)(B)(i), by refusing to terminate the tenancy of Mr. Reed, who, as articulated above, committed serious and repeated violations of the terms and conditions of the lease and who also committed violations of applicable Federal, State, or local law.

548.    The BRC Defendants discriminated against Plaintiff in violation of 42 U.S.C. § 3604(f)(2) because they regarded him as an individual who was oblivious of his rights because of severe mental impairments.

## VII.   Unlawful Intimidation, Coercion, Threats, And Interference In Violation Of 42 U.S.C. § 3617 As To The BRC Defendants And The Law Firm Defendants

549.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

550.    In violation of 42 U.S.C. § 3617, the BRC Defendants and the Law Firm Defendants coerced, intimidated, threatened, and interfered with Plaintiff in the exercise or enjoyment of, or on account of his having exercised or enjoyed rights granted and protected by 42 U.S.C. § 3604(b) and 42 U.S.C. § 3604 (f)(2).

551.    As related above, the BRC Defendants and the Law Firm Defendants were aware of Plaintiff's protected activity.

552.    Defendant Kedzior admitted that the Law Firm Defendants advised her to take adverse action against Plaintiff.

553.    As attorneys, the Law Firm Defendants were aware that their client's actions are prohibited by 42 U.S.C. § 3617 and 42 U.S.C. § 3631.

554.    By willfully providing advice contrary to the law, The Law Firm Defendants interfered with Plaintiff's housing rights.

555.    In violation of 42 U.S.C. § 3617, the BRC Defendants and the Law Firm Defendants tried twice to commit Plaintiff to a psychiatric hospital because he asserted rights under the FHA and filed a complaint with HUD on or about August 8, 2014.

556.    In violation of 42 U.S.C. § 3617, the BRC Defendants and the Law Firm Defendants tried twice to commit Plaintiff to a psychiatric hospital because he asserted his rights under the FHA and filed, pursuant to 42 U.S.C. § 3613, to have violations remedied by this Court.

557.    When civil commitment failed, in violation of 42 U.S.C. § 3617, the BRC Defendants and the Law Firm Defendants made false a false report about suspicious terrorist activities at Los Vecinos to have Plaintiff arrested by two rogue detectives.

558.    All these adverse actions are connected by Plaintiff's protected activity.

## VIII.  Unlawful Discrimination In Violation Of Section 504 Of

## The Rehabilitation Act Of 1973

559.    Plaintiff repeats, restates, and realleges all the allegations set forth

heretofore as if fully set forth herein.

560.    Plaintiff is not mentally or physically disabled. However, he has been

regarded as severely mentally impaired by defendant BRC. Therefore,

Plaintiff is a person with disabilities as defined by 29 U.S.C. § 705(9).

561.    The BRC Defendants have heretofore denied benefits of or excluded

from participating in a federally funded program or special service.

562.    Such denial was solely based on his being regarded as severely

mentally disabled.

563.    Defendant BRC is covered by the Rehabilitation Act pursuant to 29

U.S.C. § 794(b)(3)(A).

564.    The BRC Defendants denied Plaintiff a housing benefit or benefits

that are part of a program or activity receiving Federal financial assistance.

565.    Defendant BRC receives, through the State of New York, Federal

financial assistance to contract and operate transitional housing as defined

by 42 U.S.C. § 11360(29).

566.    Defendant BRC is a private entity that is eligible to directly receive

grant amounts under 42 U.S.C. § 11360(6).

567.     The BRC Defendants are required to provide Plaintiff, a mentally stable homeless individual, as defined by 42 U.S.C. § 11302, with a referral to suitable, permanent, and subsidized housing for functional and mentally stable individuals.

568.     The BRC Defendants discriminated against Plaintiff, on account of a misperceived disability, and denied Plaintiff, two years during, any appropriate housing referral for mentally stable and competent homeless individuals.

569.     OTDA and DHS regulations require that the BRC Defendants refer Plaintiff, *within nine months*, to suitable, permanent, and subsidized housing.

570.     Instead, the BRC Defendants discriminated against Plaintiff by generating fraudulent medical records so that they can meet the disability requirements set by 42 U.S.C. § 8013(i)(1)(B) and place Plaintiff to a Section 811 program for the mentally disabled.

571.     Denying Plaintiff the benefits of a Federal homeless assistance program, including the appropriate referral to suitable, permanent, and subsidized housing, has caused him serious injury.

## IX.   Unlawful Discrimination In Violation Of 42 U.S.C. §

## 12132 (Title II Of The Americans With Disabilities Act)

## as to the City Defendants

572.    Plaintiff repeats, restates, and realleges all the allegations set forth

heretofore as if fully set forth herein.

573.    Plaintiff is a qualified individual under Title II of the ADA.

574.    Plaintiff is a qualified individual under Title II of the ADA because he

has been regarded as mentally disabled by the City Defendants.

575.    Defendant City and defendant NYPD are respectively covered entities

as per 42 U.S.C. § 12131(1)(A) and (B).

576.    Plaintiff is also a qualified individual under Title II of the ADA

because of medical records generated, albeit fraudulently, by the BRC

Defendants and communicated to the City Defendants.

577.    Defendants NYPD Officers have regarded Plaintiff as a mentally

disabled individual.

578.    By reason of his misperceived disability, Plaintiff was excluded from

participation in and/or denied the benefits of the services, programs, or

activities of defendant NYPD, or was subjected to discrimination by such

public entity and its Officers.

579.    The phrase "services, programs, or activities" is "a catch-all phrase" that prohibits all discrimination by the City Defendants, including selective law enforcement.

580.    The named or unnamed NYPD Officers who were herein acting in an investigative or custodial capacity are performing "services, programs, or activities" within the scope of Title II.

581.    Those NYPD Officers and other City Defendants discriminated against Plaintiff by denying him the right to due process and the equal protection of the laws on the basis of Plaintiff's misperceived disability.

582.    The City Defendants' unlawful actions gave rise to Plaintiff's Title II claim because of wrongful arrests, where defendants NYPD Officers and detectives either wrongly arrest Plaintiff by committing him to a psychiatric hospital or arbitrarily and grossly deprived Plaintiff of his Fourth Amendment rights because the they misperceived Plaintiff's alleged disability as a criminal activity, causing him thus to suffer injury and indignity in that process.

583.    Upon numerous occasions, on account of his misperceived disability, NYPD Officers refused to investigate Plaintiff's serious allegations of assault and battery by his neighbor.

584.    Despite ample evidence and arrest warrants issued against Mr. Reed, NYPD refused to investigate Plaintiff's claims of assault and battery by this neighbor based on their misperception that Plaintiff's reports were the result of his alleged delusions and paranoia.

585.    The City Defendants did not disregard other citizens' complaints against Mr. Reed because those citizens were not regarded as or were actually mentally impaired.

586.    Based on those citizens' complaints, charges of harassment, public intoxication, and assault were filed against Mr. Reed.

587.    Warrants were subsequently issued for his arrest. He was, for instance, arrested on March 20, 2014 (Arrest No. K14624646) for failure to appear in Kings County Criminal Court.

588.    Upon information and belief, no detective was dispatched to his dwelling to violate his Fourth Amendment rights, notwithstanding that there was probable cause.

589.    By disregarding his complaints against his violent neighbor, the City Defendants discriminated against Plaintiff based on his misperceived disability.

590.    By declining to arrest Mr. Reed, against whom arrest warrants had been issued, and whose address had always been known to defendants

NYPD Officers and, at them same time, by violating Plaintiff's rights under the Fourth Amendment without probable cause, there is evidence that the City Defendants were discriminating against Plaintiff, on account of his misperceived disability, in selectively enforcing the law.

591.    On January 6, 2015, without evidence to support his decision, defendant Gaglione wrongly regarded Plaintiff as a mentally disabled individual and unlawfully curtailed his freedom by removing him to a psychiatric hospital.

592.    On January 6, 2015, defendant Gaglione removed Plaintiff and transported him to the hospital based on his *misperception* that Plaintiff was mentally ill and was conducting himself in a manner that was likely to result in serious harm to the person or others[10]. *See* NYMHY § 9.41.

593.    Plaintiff's conduct prior to the removal suggested nothing but a calm individual who was complaining to the BRC Defendants of his neighbor's acts of violence.

---

[10] The videotaped encounter establishes that the City Defendants and the BRC Defendants violated Plaintiff's rights under the Fourth Amendment and Fourteenth Amendment. *See* **https://vimeo.com/132287050/7ed5a43cc4**. The BRC Defendants violated Plaintiff's rights under the First Amendment by preventing him from videotaping acts of harassment and physical assault against him in a common area of the building. *See* **https://vimeo.com/132286926/73aa2055e9**.

594.    On June 3, 2016, Officer Hughes wrongly and biasedly regarded Plaintiff as mentally disabled and threatened to arrest him based on an alleged "medical history"[11].

595.    On June 3, 2016, Plaintiff was doing nothing but asserting his housing rights by demanding that the BRC Defendants fulfill the terms of their rental agreement and provide his room with air conditioning.

596.    As demonstrated by the recorded event, Officer Hughes and her partner were aware that Plaintiff did not commit any crime.

597.    They were aware that the BRC Defendants were harassing Plaintiff by filing a false report following his protected activity of demanding enforcement of the rental agreement.

598.    The City Defendants discriminated against Plaintiff, on the basis of his misperceived disability, and deprived him of due process and the equal protection of the laws.

---

[11] This encounter is also videotaped. *See* **https://vimeo.com/169322125/691ef6409c.**

## X.   Violation Of Plaintiff's Rights Under The First Amendment To The United States Constitution As To The BRC Defendants, The City Defendants, And The Law Firm Defendants

599.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

600.     The BRC Defendants retaliated against Plaintiff because he exercised his free speech rights in the Jack Ryan Residence and Los Vecinos.

601.     The BRC Defendants retaliated against Plaintiff because, in front of their residents, he openly expressed his discontent with their discriminatory policies, retaliatory practices, mismanagement, and other unlawful acts.

602.     The BRC Defendants tried to silence Plaintiff by removing him to a Section 811 program, which is designed for mentally disabled individuals.

603.     The BRC Defendants and the Law Firm Defendants interfered with Plaintiff's free speech activity by discrediting him and making him appear unhinged and mentally impaired in the eyes of the City Defendants.

604.     The BRC Defendants and the Law Firm Defendants made false reports to defendant NYPD and caused the latter to dispatch defendant Posternak and defendant Torres in an effort to curtail Plaintiff's free speech rights and protected housing activities.

605.     The Law Firm Defendants, while representing the BRC Defendants, unlawfully advised their client and defendant Kedzior to create fraudulent medical reports, to make false reports to defendant NYPD, and cause the latter to twice remove Plaintiff to psychiatric hospitals, all with the intent to violate his rights under the First Amendment.

606.     Plaintiff has a right to express himself as guaranteed by the First Amendment to the United States Constitution.

607.     Under the First Amendment, Plaintiff has the right to film matters of public interest, such as the use of narcotics, negligence, violence, and abuse in a transient housing and a Section 811 program facility, which all receive Federal financial assistance.

608.     Under the First Amendment, Plaintiff has the right to film and document acts of violence and threats of violence against him.

609.     Under the First Amendment, Plaintiff has the right to film and document the widespread ADA and FHA violations in the facilities operated by the BRC Defendants.

610.     Under the First Amendment, Plaintiff has the right to film and document the discriminatory, retaliatory, and hostile housing environment[12] to which the BRC Defendants had been subjecting him.

---

[12] *See* **https://vimeo.com/169318699/e918d759de**

611.    Under the First Amendment, Plaintiff has the right to film and document acts of mental abuse, physical abuse, and malicious retaliation[13] by defendant Kedzior, defendant Penater, defendant Khabir, and defendant Nicholson.

612.    Plaintiff filmed and documented unwarranted arrests and removals by the City Defendants, which were maliciously caused by the BRC Defendants to violate Plaintiff's rights under the First Amendment[14].

613.    Plaintiff's activity of filming at Los Vecinos did not invade any resident's privacy because it was documenting unlawful acts in common areas.

614.    Some of Plaintiff's filming occurred in his room to demonstrate the lack of hygiene at Los Vecinos and this residence is not habitable.

615.    Plaintiff filmed rodents[15] in his room and showed the videos to the BRC Defendants to contradict their misrepresentations to the City Defendants that he suffered from a delusional disorder and hallucinations.

---

[13] *See* **https://vimeo.com/132290823/8e64a549cb**

[14] *See* **https://vimeo.com/132287050/7ed5a43cc4**

[15] *See*  **https://vimeo.com/162452833/423050f552**
       **https://vimeo.com/162452580/1e7a334e64**
       **https://vimeo.com/162452579/8a05873c04**

616.    On January 6, 2015, the BRC Defendants caused Plaintiff to be removed and silenced because he, inter alia, had filmed his neighbors smoking K2 in front of his room.

617.    On January 6, 2015, the BRC Defendants caused Plaintiff to be removed and silenced because he had filmed Mr. Reed threatening to harm him with a rock.

618.    Although Plaintiff was not emotionally disturbed, did not show any sign of mental illness, and did not pose any risk of harm to himself or others, *see* NYMHY 9.41, the City Defendants, through defendant Gaglione and other unidentified NYPD Officers, removed him to a psychiatric hospital in retaliation to his lawful act of filming[16] said defendant performing their functions in public.

619.    The BRC Defendants' fraudulent medical evaluations and false reports to Defendant NYPD were motivated and substantially caused by Plaintiff's exercise of his right under the First Amendment.

620.    The BRC Defendants and the City Defendants actions caused Plaintiff substantial injury, including violations of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

---

[16] *See* **https://vimeo.com/132287050/7ed5a43cc4**

## XI.   Violations Of Plaintiff's Rights Under The Fourth Amendment To The United States Constitution As To The City Defendants

621.   Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

622.   Twice, Plaintiff was "seized" by NYPD Officers within the meaning of the Fourth Amendment without probable cause and without a warrant for his arrest.

623.   Plaintiff was "searched" by NYPD detectives within the meaning of the Fourth Amendment without probable cause and without a search warrant.

624.   Searches and arrests were unreasonable in the absence of a probable cause or a suspicious criminal activity.

625.   As asserted above, defendant NYPD, its Officers, or detectives have, by means of physical force or show of authority, unlawfully searched Plaintiff's room, his papers, his property, restrained his freedom of movement, and drove him, against his will, to the psychiatric hospital.

626.   Upon two occasions, they caused him to be confined in violation of the New York Mental Hygiene Law.

627.   Plaintiff's civil commitment is a curtailment of his freedom.

628.    The civil context in which Plaintiff's seizure occurred does not render the Fourth Amendment inapplicable.

629.    The City Defendants are liable because Plaintiff's arrests, commitments, and searches were unreasonable and caused Plaintiff substantial injury.

### XII.   Violation Of Plaintiff's Rights Under The Fourteenth To The United States Constitution As To The City Defendants

630.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

631.    Plaintiff's arrest and involuntary commitment violated the Due Process Clause because he was not dangerous.

632.    NYPD, its officers, and the City of New York violated Plaintiff's constitutional rights because they cannot constitutionally confine without more a non dangerous individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members.

633.    Psychiatric evaluations determined that Plaintiff is not a dangerous individual.

634.    Treating psychiatrists recommended that Plaintiff return to his dwelling because he does not pose any risk or threat of harm to himself or to others.

635.    NYMHY § 9.27 provides that a patient can be retained for involuntarily treatment beyond 15 days if two physicians certify that the patient is "alleged to be mentally ill and in need of involuntary care and treatment." This section has been interpreted to require a finding that the patient poses a danger to himself or others.

636.    On two occasions, as narrated above, Plaintiff was discharged within 72 hours.

637.    By arbitrarily committing him to a psychiatric hospital, without scrutiny and without affording him the protections set forth by NYMHY § 9.41, the City Defendants denied him the equal protection of New York law.

638.    By unlawfully searching or causing his home to be searched, without probable cause, solely based on their widespread and unlawful practice of religious profiling, the City Defendants denied Plaintiff the equal protection of the laws.

639.    By unlawfully violating his rights under the Fourteenth Amendment, the City Defendants have caused substantial injury to Plaintiff.

## XIII.  <u>False Arrest As To The BRC Defendants And The City</u>

<u>Defendants</u>

640.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

641.    Plaintiff did not physically harm or intended to harm himself.

642.    Plaintiff did not harm the Los Vecinos residents.

643.    Plaintiff did not harm defendant BRC's staff.

644.    Plaintiff did not complaint to any BRC staff member or any NYPD Officer that he was ill or not feeling well.

645.    At all times relevant, Plaintiff was not emotionally disturbed.

646.    At all times relevant, Plaintiff did not resist arrest or removal.

647.    Out of malicious and retaliatory motives, the BRC Defendants, including defendant Penater, defendant Shilson, defendant Kedzior, defendant Nicholson, along with defendant Khabir, made false reports to defendant NYPD falsely alleging that Plaintiff behavior constituted a substantial risk or threat of harm to himself, to the residents, and to defendant BRC's staff.

648.    The BRC Defendants caused Plaintiff to be falsely arrested.

649.    The City Defendants falsely arrested Plaintiff, removed him, and caused him to be confined.

650.     Confinement of Plaintiff by NYPD was not privileged under NYMHY § 9.41.

651.     Defendants NYPD, its Officers, and New York City lacked probable cause under MHYHY § 9.41 or any other penal law.

652.     Plaintiff did not commit a crime and threated to commit one.

653.     The arresting NYPD Officers did not have direct knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that Plaintiff had committed, was about to commit, or was committing a crime.

654.     On both occasions, Plaintiff was not conducting himself in a manner that is likely to result in serious harm to Plaintiff or others.

655.     Defendants lacked probable cause under NYMHY §§ 9.37, 9.41, or 9.46.

656.     Both the BRC Defendants and the City Defendants intended to confine Plaintiff.

657.     Plaintiff was conscious of the confinement.

658.     Plaintiff did not consent to the confinement.

659.     The confinement was not otherwise privileged.

660.     The BRC Defendants and the City Defendants intentionally confined Plaintiff without his consent and without justification.

661.    The City Defendants' acts were extrajudicial.

662.    The BRC Defendants caused the City Defendants' acts to be extrajudicial.

## XIV.  <u>False Imprisonment As To The BRC Defendants And The City Defendants</u>

663.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

664.    The BRC Defendants and the City Defendants intended to confine Plaintiff.

665.     Plaintiff was conscious of the confinement.

666.     Plaintiff did not consent to the confinement.

667.     The confinement was not otherwise privileged.

668.    Confinement of Plaintiff was not privileged under NYMHY § 9.41 because Plaintiff was not conducting himself in a manner which was likely to result in serious harm to himself or others.

669.    There was not probable cause or objective reasonableness for arresting Officers to determine that confinement was privileged because Plaintiff's behavior was likely to result in serious harm to himself or to others.

670.    The Fourth Amendment requires that an involuntary hospitalization, such as Plaintiff's may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.

671.    Defendants unlawfully interfered and deprived Plaintiff of his freedom to choose his own location.

672.    Defendants are liable for such interference and deprivation.

673.    Curtailment of Plaintiff's freedom was extrajudicial. The New York Mental Hygiene Law does not justify such extrajudicial confinement.

674.    The false imprisonment was without legal process or color of legal authority.

675.    Confinement was not by arrest under a valid process issued by a court having jurisdiction.

## XV.    Medical Malpractice As To The BRC Defendants

676.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

677.    On June 6, 2014, without any direct knowledge of the underlying facts, or medical examination, defendant Kedzior issued a fraudulent and

malicious report unduly, falsely, maliciously, certifying that Plaintiff suffered from chronic paranoid schizophrenia.

678.    On January 6, 2015, without any direct knowledge of the underlying facts or medical examination, defendant Kedzior issued a fraudulent and malicious report unduly, falsely, maliciously, certifying Plaintiff suffered from chronic paranoid schizophrenia.

679.    As set forth above, on both instances, defendant Kedzior did not directly witness, observed any acts or heard any statements from Plaintiff which demonstrate that Plaintiff was suffering from chronic paranoid schizophrenia or, for that matter, from any mental illness.

680.    Defendant Kedzior did not directly witness, observe acts, or directly heard statements, or used reasonable and appropriate means, not departing from standard medical practice, to ensure that Plaintiff was in need of care and treatment.

681.    An individual is "in need of care or treatment", as per NYMHY § 9.01, when that a person has a mental illness for which in-patient care and treatment in a hospital is appropriate.

682.    On both occasions, other psychiatrists determined that Plaintiff *was not in need of care and treatment* and discharged Plaintiff within 72 hours.

683.    Other psychiatrists did not confine Plaintiff to an in-patient treatment program because they determined that there was no clinical data suggesting he was suffering from a mental illness.

684.    Other psychiatrists' evaluations contradicted twice defendant Kedzior malicious allegations that Plaintiff presented the risk to cause harm to himself and others.

685.    Other psychiatrists, on both occasions, discharged Plaintiff and authorized him to return to his dwelling at Los Vecinos because they reached the conclusion that  (a) there was no risk of physical harm to Plaintiff in the absence of any threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that Plaintiff was is dangerous to  himself, and (b) there was no risk of physical harm to other persons as usually manifested by homicidal or other violent behavior by which others are placed in *reasonable fear* of serious physical harm.

686.    Defendant Kedzior did not exercise a professional judgment.

687.    Prior to the above-mentioned fraudulent reports, defendant Kedzior approved other fraudulent psychiatric evaluations authored by defendant Stuthers, defendant de Jacq, and defendant Gray.

688.    Prior to his removal and involuntary hospitalizations, Plaintiff was not examined by two physicians as mandated by NYMHY § 9.27(a).

689.     To this day, defendant Kedzior has refused to release copies of her certifications.

690.     Defendant Kedzior did not witness the above-described events warranting certification and did not examine Plaintiff for the alleged ailments leading to his hospitalization.

691.     Defendant Kedzior's alleged certification is fraudulent because it was not based on direct observation and knowledge.

692.     It was based on defendant Penater's account.

693.     Her account was motivated by retaliation and spite.

694.     Defendant Penater is not a physician and cannot issue a certification within the meaning of NYMHY § 9.27(a).

695.     However, she falsely represented to Plaintiff and other residents that she was a New York licensed psychotherapist and psychologist.

696.     Defendant's Kedzior's misdiagnosis and false reports to NYPD were to curtail Plaintiff's freedom by maliciously committing him, without any valid medical or safety reason, to a psychiatric hospital.

697.     Since 2011, defendant Kedzior has been engaging in this pattern of medical fraud by issuing fraudulent misdiagnoses, by condoning the same, by failing to train and supervise her staff, by writing fraudulent prescriptions, by employing incompetent practitioners, by willfully and

maliciously concealing identifiable healthcare information from her patients, by denying access to medical records, by allowing unqualified and unlicensed employees to practice psychiatry and prescribe medication, by making fraudulent referrals and reports to her colleagues and to government agencies.

698.     Under New York law, defendant's practice is a departure from good and accepted medical practice.

699.     Such departure was a proximate cause of Plaintiff's injury.

## XVI.  **Fraudulent Concealment As To The BRC Defendants**

700.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

701.     Defendant BRC and its staff had a duty to diligently, fully, and explicitly disclose the nature of their housing referral to Plaintiff.

702.     The BRC Defendants referred Plaintiff to Los Vecinos but failed to do so.

703.     The BRC Defendants misrepresented to Plaintiff that Los Vecinos is a community for mentally stable and competent tenants.

704.     The BRC Defendants did not inform Plaintiff that Los Vecinos is, in fact, a Section 811 program designed for severely mentally disabled individuals.

705.   The BRC Defendants did not inform Plaintiff that Los Vecinos is a mental health facility.

706.   The BRC Defendants did not inform Plaintiff that Los Vecinos is a "harm reduction" facility where tenants may use narcotics, alcohol, and tobacco.

707.   The BRC Defendants did not inform Plaintiff, who does not smoke, that other tenants at Los Vecinos may smoke in their rooms and that smoke may travel to Plaintiff's room.

708.   The BRC Defendants did not inform Plaintiff that they would not be able to enforce or cause to be enforced the Los Vecinos internal rules, their rental agreements with the tenants, local, state, and Federal housing laws and regulations.

709.   The BRC Defendants misrepresented to Plaintiff that Los Vecinos is a facility free of tobacco, narcotics, and alcohol.

710.   The BRC Defendants misrepresented to Plaintiff that Los Vecinos is a housing environment free of harassment and violence.

711.   The evidence supporting the allegations contradicts the BRC Defendants' misrepresentations.

712.   It is clear that the BRC Defendants made material misrepresentations of fact to Plaintiff.

713.     Said misrepresentations were made intentionally in order to (1) mislead Plaintiff and have him move out of the Jack Ryan Residence and (2) to defraud the United States by receiving Section 8 payments in violation of 42 U.S.C. § 3544 and 18 U.S. C. § 1035.

714.     Plaintiff reasonably relied on the BRC Defendants' misrepresentations as he moved into Los Vecinos.

715.     By relying on the BRC Defendants' misrepresentations, Plaintiff suffered physical and psychological injuries as a result.

## XVII. Gross Negligence As To The BRC Defendants

716.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

717.     By allowing the use and sale of narcotics within the premises of the Jack Ryan Residence and Los Vecinos, the BRC Defendants engaged in a conduct, which falls below the standard established by the Federal, state, and local laws for the protection of Plaintiff and others against unreasonable risk of harm.

718.     Allowing the use and sale of narcotics within the premises of Los Vecinos resulted in Plaintiff's injury as caused by Mr. Reed's acts of assault and battery.

719.     Such repeated violent acts led to Plaintiff's broken rib.

720.     Negligent lack of hygiene let rodents multiply and spread at Los Vecinos,  causing thus poisoning to Plaintiff and other residents.

721.     Acts of tolerating narcotics, violence, and crimes of moral turpitude, of which Plaintiff has been complaining and which affected him directly, is caused by the BRC Defendants' heedlessness or inadvertence.

722.     The BRC Defendants' acts are not acceptable conduct by the standard determined through experience.

723.     They are neither acceptable to any reasonable mind.

724.     The BRC Defendants' acts constitute gross negligence because they are a failure to exercise even that care which a careless person would use.

725.     The BRC Defendants owed a duty to protect Plaintiff and his property within the premises of the Jack Ryan Residence per NYMHL § 33.07.

726.     Defendants breached said duty.

727.     The breached duty caused physical and emotional injury to Plaintiff.

## XVIII.   Negligent Infliction Of Emotional Distress As To All Defendants

728.     Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

729.     All defendants negligently caused Plaintiff's emotional distress.

730.    The defendants' above-described egregious acts fall within a pattern of extreme and outrageous conduct.

731.    By allowing this outrageous pattern of unlawful acts to happen, the defendants exposed Plaintiff to abuse, violence, and theft.

732.    By allowing these egregiously unlawful acts to happen, defendants showed that they had intent to cause, or had reckless disregard of a substantial probability of causing, severe emotional distress to Plaintiff.

733.    Because of these outrageous acts, Plaintiff's privacy was invaded and his property was stolen.

734.    Defendant's acts caused humiliation to Plaintiff.

735.    Defendants' false arrests and imprisonments are malicious and outrageous.

736.    They are not privileged.

737.    Defendants' acts are so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

## XIX.  <u>Intentional Infliction Of Emotional Distress As To All Defendants</u>

738.    Plaintiff repeats, restates, and realleges all the allegations set forth heretofore as if fully set forth herein.

739.    Defendants intentionally committed the above-enumerated statutory and constitutional violations against Plaintiff.

740.    Their unlawful acts constitute extreme and outrageous conduct.

741.    Defendants' conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.

742.    Defendants' conduct is atrocious and utterly intolerable in a civilized society.

743.    Their conduct was intended to cause severe emotional distress upon Plaintiff.

744.    Their egregious conduct caused to Plaintiff severe injury.

745.    As demonstrated above, there is a direct connection between Defendants' egregious and the injury suffered by Plaintiff.

746.    Their egregious conduct caused a Plaintiff a severe emotional distress.

## H. <u>JURY TRIAL DEMAND</u>

747.    Plaintiff demands a jury trial on any issue triable of right by a jury.

## I.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court grant him:

a.  Injunctive relief ending all Defendants' unlawful acts, practices, customs, and policies;

b.  Declaratory relief;

c.  Compensatory damages;

d.  Liquidated damages where applicable;

e.  Treble damages where applicable;

f.  Punitive damages;

g.  Attorney's fees;

h.  Expert's fees; and

i.  Any other relief that this Court may deem fair, just, and equitable.

Respectfully submitted on this 20th day of July, 2016

By:    HICHAM AZKOUR, pro se
        _____

111